AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

2017 Toyota RAV4, Ohio license plate HNN-1641

)
)
)
)
)
)

Case No.

2:19-mj-720

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

located in the _____ Southern _____ District of _____ Ohio _____, there is now concealed *(identify the person or describe the property to be seized)*:

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Section 846 | Conspiracy to Distribute and to Possess with Intent to Distribute a Controlled Substance |
| 18 USC Section 1956 | Conspiracy to Launder Money |

The application is based on these facts:

See Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Kevin Doyle Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: Sept 16, 2019

City and state: Columbus, Ohio

*Judge's signature*

Kimberly A. Jolson United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Kevin Doyle, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with Internal Revenue Service, Criminal Investigation (IRS-CI), where I have been so employed since September 2009. I am presently assigned to the Columbus, Ohio, Post of Duty. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, where I received specific training in the area of criminal investigation. I also received instruction on the legal concept of probable cause, as it relates to search and seizure warrants, and methods and practices of executing such warrants. Over the last nine years I have personally conducted and assisted other law enforcement officers, on numerous investigations involving the following crimes: tax evasion, identity theft, wire fraud, conspiracy, narcotics, and money laundering. The information set forth in this affidavit comes from my personal involvement in this investigation, as well as information provided to me by other law enforcement officers.

2. Your Affiant has investigated and is continuing to investigate the following individuals and businesses for various offenses related to narcotics trafficking and money laundering:

   A. **JOSE LUIS ROSALES-OCAMPO ("JOSE ROSALES") and JOSE LUIS ROSALES LLC, DBA LOS ROSALES ("LOS ROSALES");**

   B. **THANIA ROSALES-GUADARRAMA AKA "NATALIE" ("THANIA ROSALES") and LOS ROSALES 2 LLC ("LOS ROSALES 2");**

   C. **JOSUE GAMA-PEREZ ("JOSUE GAMA") and EXPRESS CELLULAR Y MAS LLC ("EXPRESS CELLULAR");**

D. **DULCE ROSALES-GUADARRAMA ("DULCE ROSALES"), AKA DULCE ROSALES, AKA DELCY BONILLA-CHACON, AKA DELCY N. BONILLA, AKA DULCE BONILLA; AKA "POOCHIES"; AKA "PUCHONA";**

E. **ELIEZAR MENDOZA-NAVA ("MENDOZA-NAVA");**

F. **RODRIGO ESQUEDA-VAZQUEZ ("ESQUEDA-VAZQUEZ");**

G. **JULIO ANGEL HOMER GONZALEZ ("GONZALEZ");**

H. **RODOLFO FRANCO-VALDEZ ("FRANCO-VALDEZ").**

3. Based on the facts set forth herein, my experience, and the experience of other law enforcement officers with whom I have conferred, I submit that there is probable cause to believe that between 2013 and 2019, the exact dates being unknown, the above named individuals conspired with others to distribute narcotics in the Southern District of Ohio, in violation of Title 21 U.S.C. § 846; and to launder narcotics proceeds from the Southern District of Ohio, to Mexico, through the businesses **LOS ROSALES, LOS ROSALES 2**, and **EXPRESS CELLULAR**, all in violation of Title 18 U.S.C. § 1956(h).

4. The purpose of this affidavit is to secure Search Warrants for the following locations, to include the curtilage and any vehicles on the curtilage--

A. **LOS ROSALES:**

i. 1028 Shady Lane Rd., Columbus, OH 43227, (business location of **LOS ROSALES**, owned and operated by **JOSE ROSALES**); and

ii. 1805 Elaine Rd., Columbus, OH 43227, (residence of **JOSE ROSALES**).

B. **LOS ROSALES 2:**

i. 4340 East Main St., Suite A, Columbus, OH 43213, (business location of **LOS ROSALES 2**, owned and operated by **THANIA ROSALES**); and

ii. 3470 Oak Bend Blvd., Canal Winchester, OH 43110, (residence of **THANIA ROSALES**).

C. **EXPRESS CELLULAR:**

    i. 4260 Eastland Square Dr., Columbus, OH 43232, (business location of **EXPRESS CELLULAR**); and

    ii. 720 Preston Trails Dr., Pickerington, OH 43147, (residence of **JOSUE GAMA** and **DULCE ROSALES**).

D. **Vehicles:**

    i. 2013 GMC Terrain, Ohio license plate HNE-1210, red in color, registered to **JOSE LUIS ROSALES-OCAMPO;**

    ii. 2017 Toyota RAV4, Ohio license plate HNN-1641, black in color, registered to Luis Alcauter (known to be driven by **THANIA ROSALES);**

    iii. 2017 Acura MDX, Ohio license plate HHH-6056, white in color, registered to **JOSUE GAMA-PEREZ;** and

    iv. 2000 Chevrolet Express Cargo, Ohio license plate GBA-6818, white in color, registered to Windows and Houses Cleaning Gama.

5. This affidavit will provide probable cause to believe that searches of these locations will uncover fruits, evidence, or instrumentalities of a crime, namely criminal violations of Title 18 U.S.C. § 1956, and 21 U.S.C. § 846. All of these locations are described more specifically in **Attachment A.** The items to be seized are documented in **Attachment B.**

6. NOTE: All dates, times, and amounts set forth subsequently in this Affidavit should be understood to be approximate.

7. NOTE: Whitehall is a city in Franklin County, Ohio, and an enclave on the east side of Columbus. For the purposes of this Affidavit, Whitehall and Columbus will be understood to be synonymous.

8. NOTE: **ELIEZAR MENDOZA-NAVA, RODRIGO ESQUEDA-VAZQUEZ, JULIO ANGEL HOMER GONZALEZ,** and **RODOLFO FRANCO-VALDEZ (FRANCO-**

**VALDEZ)** were all subjects of narcotics investigations and have been indicted on narcotics charges in Franklin County.

# CASE BACKROUND

## Financial Crimes Enforcement Network

9. The following guidance was provided by the Financial Enforcement Crimes Network (FinCEN). I am familiar with FinCEN's guidance, and the below information, from training and from my experience as an investigator.

10. In 2011, FinCEN issued a final rule ("2011 MSB Final Rule") defining a money services business ("MSB") as, "a person wherever located doing business, whether or not on a regular basis or as an organized or licensed business concern, wholly or in substantial part within the United States," operating directly, or through an agent, agency, branch, or office, who functions as, among other things, a "money transmitter."

11. FinCEN's regulations define the term "money transmitter" to include a "person that provides money transmission services," or "any other person engaged in the transfer of funds."

12. The term "money transmission services" is defined by FinCEN to mean the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means.

13. The Bank Secrecy Act ("BSA") regulatory framework begins with the expectation that financial institutions will operate under a culture of compliance supported by senior leadership, including owners, boards of directors, and senior executives. This culture of compliance will dictate the basic norms of behavior, knowledge, and transparency under which the management team, employees, and service providers will be held accountable.

14. The BSA and its implementing regulations require MSBs to develop, implement, and maintain an effective written anti-money laundering program ("AML program") that is reasonably designed to prevent the MSB from being used to facilitate money laundering and the financing of terrorist activities. The AML program must, at a minimum: (a) incorporate policies, procedures and internal controls reasonably designed to assure ongoing compliance (including verifying customer identification, filing reports, creating and retaining records, and responding to law enforcement requests); (b) designate an individual responsible to assure day-to-day compliance with the program and BSA requirements; (c) provide training for appropriate personnel, including training in the detection of suspicious transactions; and, (d) provide for independent review to monitor and maintain an adequate program.

15. The AML program must be approved by the owner of the financial institution, or by the owner's representative (in the case of a corporation, such representative is the Board of Directors). To assure that an AML compliance program is reasonably designed to meet the requirements of the BSA, MSBs should structure their programs to be risk-based. According to FinCEN MSBs should assess their individual exposure to the risk of money laundering, terrorism finance, and financial crime based on the composition of customer base, the geographies served, and the financial products and services offered. MSBs must properly manage customer relationships and effectively mitigate risks by implementing controls commensurate with those risks.

16. A well-developed risk assessment is part of sound risk management and assists MSBs in identifying and providing a comprehensive analysis of their individual risk profile. As part of its risk assessment, an MSB should determine both the identity and the profile of its customers, and MSBs must know enough about their customers to be able to determine the risk level they represent to the institution.

# Overview of a Wire Transfer

17. Corporate MSBs often contract through numerous agents to provide wire transfer services. (NOTE: The term "wire transfer" is used throughout this affidavit. "Wire transfer" should be understood to be a money transfer through an MSB as opposed to a transfer through a traditional bank). As an example from this investigation, Girosol Corporation is a corporate MSB and **LOS ROSALES** serves as their agent.

18. In the typical transaction, the wire transfer process begins when a customer (sender) enters into an authorized MSB agent for the purpose of sending money to a receiver (beneficiary).

19. The MSB agent is either connected to their corporate MSB via a computer terminal or by a direct telephonic connection (often a red phone as described herein).

20. The customer provides their own name, address, and telephone number. The customer also provides the name of the receiver (beneficiary) of the wire transfer, as well as the receiver's city, state, and country.

21. The customer will either provide this information directly to an employee at the MSB agent location for the employee to enter it into the corporate MSB computer system, or the customer uses the red telephone at the sending agent location to speak directly with an operator who works for the corporate MSB; either way the same result is achieved.

22. After the information is collected, the sender provides the principal amount to be transferred including the send fee, in cash to the MSB agent. The fee for a wire transfer from the United States to Mexico is often $10. The sender is then provided a receipt containing all of the provided information plus the date and time the transfer was sent and a unique transaction number sometimes called an MTCN (Money Transfer Control Number). This MTCN number is

provided by the customer to the intended beneficiary and is required for the wire transfer to be paid out in Mexico.

23. MSB agents must provide the corporate MSB with the cash they have collected from conducting wire transfers for customers. MSB agents generally provide this cash through bank deposits.

24. According to the BSA and its implementing regulations, MSB agents that provide money transfer services must obtain and record specific information for each money transfer of $3,000 or more, regardless of the method of payment. Many corporate MSBs impose more stringent requirements upon their agents and require them to maintain the sender's information for lower dollar transactions—such as any transaction above $1,000.

25. The corporate MSB relies upon their contracted MSB agents to follow anti-money laundering corporate policies and state and federal laws and regulations.

## MSB Money Laundering and the "Many to Many" Scheme

26. The Arizona Attorney General maintains a centralized searchable database of the financial transactions of global MSBs. This database is maintained by analyst and law enforcement professionals recognized as experts in money laundering activity. This database provides data, meaningful data analysis, collaboration and training to investigators, analysts, and prosecutors nationwide in their efforts to disrupt criminal organizations and dismantle their operations.

27. The analysis of transaction data supplied by multiple MSBs over a period of time reveals the preferred and most often frequented MSBs by organized criminals; the data further reveals potential vulnerabilities in AML programs of participating MSBs.

28. Based on my experience, research, and consultation with other law enforcement officers, I know it is common for drug trafficking organizations to use recording and paying agent locations of MSBs to launder probable heroin, fentanyl and methamphetamine proceeds from U.S.

distribution cities to drug source cities in Mexico. An Intelligence Report issued by the Arizona Attorney General ("AAG") in March of 2015, titled, "Money Transmission Techniques Used in the Sinaloa Corridor," revealed three overarching techniques utilized by drug traffickers to remit cash through MSBs to sources in Sinaloa, Mexico. Two of the techniques, "Many to One," defined as many sender names sending to one recipient name; and "One to Many," defined as one sender name to many recipient names, were discussed in detail in a December 2014 Intelligence Report issued by the AAG which was titled, "Correlation Between U.S. Heroin Markets and Money Transfer Payments to Mexico Source Areas."

29. MSB anti-money laundering compliance systems, as currently designed, detect and interdict high risk frequent payouts to one recipient from multiple senders or the inverse—high frequency transfers from one sender to many payees. The third money laundering technique referenced above involves money transfers from many non-repetitive sender names to many different payee names in a defined high risk corridor (otherwise known as the "Many to Many" typology). Automated tools designed to detect the "Many to Many" typology have not as yet been developed by the MSB industry.

30. As an example of the "Many to Many" typology, AAG financial analysts received information from law enforcement in early 2015 about an arrested suspect in Phoenix, Arizona who was found in possession of approximately 80 MSB transaction receipts and over two pounds of heroin. The seized money transfer receipts were analyzed and revealed only two recording agents in the Phoenix metropolitan area which had sent approximately $80,000 in money transfers over a two day period. Subsequent investigation of the two recording agent locations and analysis of several months of transaction activity revealed the agent owners were working directly with heroin trafficking organizations in the Phoenix metro area by structuring bulk drug cash into

outbound money transfers. The bulk cash structuring methodology employed by the two associated recording agents to circumvent AML compliance systems and analytics was subsequently named "Many to Many" by AAG analysts. (NOTE: As explained later in this Affidavit the **JOSE ROSALES MLO** utilizes a "Many to Many" scheme. The scheme utilized by the **JOSE ROSALES MLO** varies from the scheme that is described by the AAG in that the **JOSE ROSALES MLO** will use sender information more than once.)

## "Many to Many" Emerging Risk

31. The "Many to Many" money laundering typology remains very difficult to detect by law enforcement and MSB compliance analysts because it involves transactions intentionally structured with non-repetitive sender and payee names and associated identities. Multiple recent law enforcement investigations revealed complicit recording agents receiving bulk cash deliveries from drug cash couriers along with lists of payee names and locations to whom transfers are to be sent. The common definition of "complicit" is: "involved with others in an illegal activity or wrongdoing." Based on my experience, research, and consultation with other law enforcement officers, I am aware that as cash accumulates from drug sales in distribution cities, couriers transport portions of the cash to complicit recording agents along with lists of payee names located in Mexico drug source cities. Recording agents collaborate with traffickers by fabricating different unique sender names and identities for every unique payee name. Those sender identities are often used no more than twice and then never appear again in transaction activity—all making it difficult for law enforcement to track and analyze. Involved recording agents then structure the falsified transactions to be just below the corporate MSB's identification threshold, which in turn enables the recording agent to send the most cash per transaction without also fabricating a fake government ID number. The involved recording

agents in turn are required to provide cash couriers with receipts for each completed transaction in order to receive their fees and to prove the cash was sent as directed. Corrupt recording agents are anxious to receive more deliveries of cash and payee name lists because they receive an agreed upon fee from traffickers for each sent money transfer. The drug cash couriers then send images of the receipts to traffickers in the intended payout cities in Mexico. Traffickers in drug source locations then collaborate with complicit paying agents by providing the transaction receipts including the money transfer reference numbers. Complicit paying agents then simply pay out the transfers sent to various payee names to a trafficker in drug source locations.

32. Using the "Many to Many" method, the sending and paying agent locations are not knowingly working directly with one another but are instead individually complicit with drug traffickers operating in their respective areas. The "Many to Many" money laundering method is sophisticated and designed to function more clandestinely than the other "One to Many" or "Many to One" methods, which are also simultaneously detected in high risk corridors.

## JOSE ROSALES Money Laundering Organization

33. In 2017, investigators with the High Intensity Drug Trafficking Area ("HIDTA") Task Force, Columbus Police Department, and Ohio Organized Crime Investigations Commission, began investigating a Drug Trafficking Organization ("DTO") that was believed to be distributing Heroin in the Southern District of Ohio. During this investigation it was discovered that on more than one occasion, a member of this DTO went to a business on the east side of Columbus, OH, that claimed to be a cell phone store.

34. Investigators later discovered that this cell phone store was serving as an agent for more than one money transfer service. Records obtained from these money transfer services detailed millions of dollars in wire transfers from the cell phone store to Mexico.

35. Additional investigative work uncovered probable cause to believe that there were in fact three cell phone stores on the east side of Columbus, OH, that were associated with one another, and all serving as Third Party Money Launderers ("3PML") for various Mexican DTOs.

36. By the end of 2018, both the IRS-CI and the Drug Enforcement Administration (DEA) were participating in this investigation.

37. The three cell phone stores known to be involved in the **JOSE ROSALES MLO** are as follows:

    A. **LOS ROSALES**-Located at 1028 Shady Lane Rd., Columbus, OH 43227. **LOS ROSALES** is owned by **JOSE ROSALES**. **JOSE ROSALES** is the father of **THANIA ROSALES (LOS ROSALES 2)** and **DULCE ROSALES (EXPRESS CELLULAR)**.

    B. **LOS ROSALES 2**-Located at 4340 East Main St., Suite A, Columbus, OH 43213. **LOS ROSALES 2** is owned by **THANIA ROSALES**. **LOS ROSALES 2** was formerly located at 3307 East Main St., Columbus, OH 43213.

    C. **EXPRESS CELLULAR**-4260 Eastland Square Dr., Columbus, OH 43232. **EXPRESS CELLULAR** is owned by **JOSUE GAMA** (husband of **DULCE ROSALES**). The Ohio Secretary of State lists **DELCY N. BONILLA (AKA DULCE ROSALES)** as the Incorporator of **EXPRESS CELLULAR**.

38. Evidence established during this investigation and subsequently detailed in this Affidavit establishes probable cause that the **JOSE ROSALES MLO**, at a minimum, utilized their cell phone stores as a disguise for a sophisticated money laundering operation. This affidavit will also establish probable cause that the **JOSE ROSALES MLO** conducted wire transfers, structured into amounts of less than $1,000 from larger quantities of bulk cash, with what they believed were the proceeds of a Specified Unlawful Act ("SUA"), namely narcotics trafficking, from the Southern District of Ohio, to Mexico. Records obtained from various wire transfer

services show that the wire transfers initiated from members of the **JOSE ROSALES MLO** to Mexico exceed $40,000,000 from approximately 2013 to 2019.

39. The evidence provided subsequently in this affidavit will include:

    A. Witnesses: Numerous admitted narcotics traffickers provided statements regarding their interaction with the **JOSE ROSALES MLO**.

    B. The Anti-Money Laundering Training received by the members of the **JOSE ROSALES MLO**. As agents for wire transfer services the **JOSE ROSALES MLO** received training on subjects including the definition of money laundering, structuring transactions, and willful blindness.

    C. Evidence establishing the relationship between the **JOSE ROSALES MLO** and narcotics traffickers **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ**.

    D. Receipts: During the course of this investigation numerous receipts were recovered for wire transfers from the **JOSE ROSALES MLO** that have been altered to remove the name of the agent (i.e. **LOS ROSALES**) and the name of the wire transfer service (e.g. Sigue).

    E. Lists: Several lists were recovered from the phones of narcotics traffickers that match up exactly with beneficiaries of wire transfers from the **JOSE ROSALES MLO**.

    F. Evidence that the listed sender information for wire transfers from the **JOSE ROSALES MLO** is fictitious.

    G. Evidence establishing the relationship between the **JOSE ROSALES MLO** and narcotics traffickers **JULIO ANGEL HOMER GONZALEZ** and **RODOLFO FRANCO-VALDEZ**.

H. Evidence establishing the relationship between the **JOSE ROSALES MLO** and narcotics trafficker **JUAN RODRIGUEZ-JIMENEZ.**

I. Video Surveillance: During the course of this investigation video surveillance was used to determine if actual customers were entering and exiting **JOSE ROSALES MLO** stores in a manner that harmonized with wire transfer records. Investigators determined that in more than one instance customer arrivals and departures were far less than the number of wire transfers sent from the **JOSE ROSALES MLO** during the same time period.

J. Evidence that, during time periods relevant to this Affidavit, multiple wire transfer services discontinued their business relationship with the **JOSE ROSALES MLO** based on the activity of the MLO.

K. Sales and Income: During the course of this investigation sales tax and income tax records related to the **JOSE ROSALES MLO** were obtained. Sales tax records provided to Your Affiant reflect Reported Taxable Sales Amounts for the **JOSE ROSALES MLO** that average less than $3,000 a month. Further, the alleged annual Total Income of the members of the **JOSE ROSALES MLO** was often below $20,000.

L. Asset Accumulation: Several members of the **JOSE ROSALES MLO** have acquired assets and have significant banking activity.

M. Statistical Analysis: Wire transfer data was analyzed for each of the member stores of the **JOSE ROSALES MLO**. This examination revealed the majority of these wire transfers are conducted to Mexico in amounts less than $1,000.

N. Statistical Analysis by the office of the Arizona Attorney General: Analysts with the Arizona Attorney General studied the wire transfer activity of the **JOSE ROSALES**

**MLO** and observed that it displayed many of the common red flags for Money Laundering Organizations.

O. Evidence establishing the ownership and control of the member stores of the **JOSE ROSALES MLO**.

# PROBABLE CAUSE: JOSE ROSALES MLO

## Witnesses

### LOS ROSALES - 1028 Shady Lane Rd., Columbus, OH 43227

40. Witness #1 is an admitted narcotics trafficker. According to Witness #1, on the East side of Columbus, off of Main St., near a Golden Corral and behind a Shell, there's a cell phone store that wires money. (NOTE: This location and description match **LOS ROSALES**.) The store looks like a real cell phone store and Witness #1 did see people purchasing cell phones and tablets. Every week for approximately a month in 2017, Witness #1 took approximately $6,000 in cash to the cell phone store so that it could be wired to Nayarit, Mexico. The individual that ran the cell phone store was a Mexican male. Witness #1 never knew the real name of the Mexican male. The Mexican male never asked any questions and just accepted money from Witness #1. The wire transfers never contained the real name of Witness #1 because the Mexican male never even knew the real name of Witness #1. The Mexican male charged Witness #1 $150 per $1,000 wired. Approximately six names would be provided to wire $6,000 and the names were switched out each week. The Mexican male was in contact with Witness #1's source of supply for narcotics in Mexico. It was Witness #1's source of supply that originally told him/her to take money to the Mexican male. The first time Witness #1 went to the cell phone store he/she was talking to their source and then handed the phone to the Mexican male. Witness #1's source of supply also had another individual that took money to the Mexican male. The confirmation numbers for the wire transfers were sent from the Mexican male to Witness #1 through WhatsApp and then Witness #1 sent them on to Mexico. The doors to the cell phone store stay locked and Witness #1 had to call ahead of his/her arrival. Once inside the store, Witness #1 saw $15,000-$20,000 on the table and there were other individuals dropping off money.

"Definitely…yeah," said Witness #1 when asked whether the Mexican male knew the money was from the sale of narcotics. The Mexican male asked Witness #1 for Cocaine. Witness #1 clarified that the Mexican male wasn't looking for a user amount of Cocaine; instead the Mexican male wanted a bulk quantity for someone else. Witness #1 was unable to supply the Mexican male with Cocaine.

41. Witness #2 is an admitted narcotics trafficker and a former member of a DTO that distributed Heroin in the Southern District of Ohio. Witness #2 participated in a ride along with investigators from HIDTA and directed them to each of the three stores known to be members of the **JOSE ROSALES MLO**. The same source of supply that directed Witness #2 to take cash to 4340 East Main St., Suite A, Columbus, OH 43213 (NOTE: this is described subsequently), advised other narcotics traffickers to take money to 1028 Shady Lane Rd., Columbus, OH 43227 (NOTE: this is the location of **LOS ROSALES**.) There is a dark skinned male Hispanic at 1028 Shady Lane Rd., and he is the father of the female at 4340 East Main St. Witness #2 stated that the individuals at these two stores know the source of the funds being brought to them because of the large amounts. The other narcotics traffickers would tell Witness #2 that they had dropped off $80,000 or $100,000 at these stores.

42. Witness #3 is an admitted narcotics trafficker and a former member of a DTO that distributed Heroin in the Southern District of Ohio. In approximately February or March of 2018, Witness #3's source of supply for Heroin gave him/her $300 for gas and a brown paper bag full of cash. The source of supply advised Witness #3 to drive to a gas station in Columbus, OH. Witness #3 stated that while he/she was sitting at the gas station two Mexican males walked up to his/her car and instructed Witness #3 to follow them to a cell phone store behind the gas station. Witness #3 stated that he/she entered the store with the brown paper bag of money and handed it to one of

the Mexican males that had walked over to the gas station. Witness #3 stated the Mexican male took the money into the back room and Witness #3 could hear a money counter machine running. Witness #3 stated the male exited the back room and nodded at Witness #3 indicating it was OK and Witness #3 left. Witness #3 stated the very next day he/she drove to Dayton for the source of supply to pick up Heroin. Witness #3 stated that he/she pulled into a parking lot and a large African American male approached his/her car. The African American male dropped a package of Heroin through the window of Witness #3's vehicle and only said "600". Witness #3 stated that he/she understood this to mean 600 grams of Heroin. Witness #3 stated that he/she transported the Heroin back to the source of supply. Witness #3 stated that he/she delivered cash to this store approximately five times. Each time Witness #3 went to the store he/she always dealt with the same Mexican male. Witness #3 identified photos of **JOSE ROSALES** as the Mexican male he/she dealt with each time. Witness #3 also identified a photo of **JOSUE GAMA** as someone he had seen at the store on one occasion. **JOSUE GAMA** was coming from the back of the store when Witness #3 saw him. Witness #3 was provided an aerial map of the area of Shady Lane and Main Street and Witness #3 immediately pointed out 1028 Shady Lane Rd. Witness #3 called it a fake cell phone store because it operated as a front business and there's nothing in there.

43. Witness #4 is an admitted narcotics trafficker. At the request of investigators, Witness #4 made contact with **JOSE ROSALES** within the last year. This contact took place at 1028 Shady Lane Rd., Columbus, OH 43227. Investigators conducted surveillance of **LOS ROSALES** while Witness #4 met with **JOSE ROSALES**. Witness #4 wanted to know if **JOSE ROSALES** could wire money for Witness #4. **JOSE ROSALES** asked how much money and Witness #4 told him approximately $15,000. **JOSE ROSALES** told Witness #4 this could be done and the fee would

be $100 for each $1,000 wired. If the transfers were frequent **JOSE ROSALES** would lower the price to $50 for each $1,000.

44. Witness #5 is a former Supervisor for Brinks. In approximately May 2017, Brinks started picking up from two new customers. One of the customers was located at 1028 Shady Lane. Witness #5 personally went to the store twice and it appeared the business was just starting. Witness #5 dealt with an older Hispanic gentleman who was polite and dressed business casual. Witness #5 never saw any customers at the store. The business had a Brinks safe. Brinks would pick up once a week from the store. The smallest amount of money picked up was approximately $80,000 and the most was approximately $120,000. The safe would be completely emptied during the Brinks pick up. Witness #5 called the store on Shady Lane "Transfast" because he didn't know what else to call it and he/she couldn't locate a store name anywhere. Witness #5's employees told him/her there was "nothing" in this store. There were two display cases that contained "junk." Witness #5 described the "junk" as the type of items you would find at gas station and provided an example of a USB cord. Additionally, the door was locked and the Brinks employees had to knock to get in. Inside of the store there were kids on the floor doing homework. Witness #5 stated he/she wasn't sure this was a cell phone store but that's the closest description of what the business is.

45. Witness #6 is an admitted narcotics trafficker. In 2019, law enforcement observed Witness #6 enter **LOS ROSALES** at 1028 Shady Lane Rd., Columbus, OH 43227. According to Witness #6 on approximately two occasions he/she entered **LOS ROSALES** (NOTE: Witness #6 did not know the name of this business) for the purposes of delivering bulk amounts of cash. Witness #6 was directed to **LOS ROSALES** by his/her source of supply for Fentanyl. When Witness #6 arrived outside of **LOS ROSALES** he/she called their source of supply, and the source of supply

called **LOS ROSALES**. The door was locked and Witness #6 had to be buzzed into **LOS ROSALES**. Once Witness #6 entered the door was locked behind him/her. Witness #6 dealt with a heavyset old man inside of the business. The store had a money counter and bank bands. The money provided by Witness #6 was processed through the money counter and then the old man called Witness #6's source of supply to tell him the amount of the money. This call was not made on speaker phone. Witness #6 is sure the total money he/she took to **LOS ROSALES** was at least $50,000. All of the money Witness #6 took the store was proceeds of Fentanyl. Witness #6 identified photos of **JOSE LUIS ROSALES OCAMPO** as the man he/she dealt with at the business, and stated, "Definitely for sure."

## LOS ROSALES 2 - 4340 East Main St., Suite A, Columbus, OH 43213

46. Witness #2 (referenced above) is an admitted narcotics trafficker and a former member of a DTO that distributed Heroin in the Southern District of Ohio. Witness #2 participated in a ride along with investigators from HIDTA and directed them to each of the three stores known to be members of the **JOSE ROSALES MLO**. Witness #2 advised that his/her source of supply for Heroin takes money to 4340 East Main St., Suite A, Columbus, OH 43213 (business address of **LOS ROSALES 2**). Witness #2's source of Heroin used to bring money to this store. On one occasion in 2018 this same source of supply asked Witness #2 to deliver $20,000 in cash to a female at this location. The cash was packaged in a bag from a shoe store. Witness #2 described the female as Hispanic, skinny, and Spanish speaking. The only thing Witness #2 told the female was who it was that sent Witness #2 to the store and that the package Witness #2 was delivering was for the female. The female grabbed the bag containing the cash and Witness #2 left.

47. Witness #7 is a convicted narcotics trafficker. Witness #7 identified photos of 4340 East Main St., Suite A, Columbus, OH 43213, and 3307 East Main St., Columbus, OH 43213 (prior

business address of **LOS ROSALES 2**), as places where he/she had previously dropped cash off at. Witness #7 estimated that he/she delivered cash to this business approximately 11-15 times total beginning in 2017. Each time Witness #4 provided approximately $3,000-$5,000 and the most Witness #7 ever delivered was $6,000. When Witness #7 dropped off cash, he/she dealt with a girl he/she knew as **"NATALIE."** Witness #7 was shown photos of several women and positively identified **THANIA ROSALES** as the woman known to him/her as **"NATALIE"**. Witness #7's level of certainty was 100%. According to Witness #7, the only person he/she ever dealt with was **"NATALIE"** and on one occasion there was an old man. According to Witness #7 the old man was approximately 55 years old and had a droopy eye. Witness #7 identified a photo of **JOSE ROSALES** as the old man. Witness #7 was asked if **"NATALIE"** knew the money she was wiring was drug proceeds and responded "Oh yea." The names that are used as the senders of the wire transfers are made up and **"NATALIE"** charges $50 per $1,000 wired.

48. Witness #8 is not a narcotics trafficker but has known **THANIA ROSALES** since at least 2015. On more than one occasion **THANIA ROSALES** and Witness #8 have discussed narcotics trafficking in the Southern District of Ohio. According to Witness #8, **THANIA ROSALES** did not know **MENDOZA-NAVA's** name but did know that **MENDOZA-NAVA** was working for a narcotics trafficker by approximately August of 2018. After the arrest of **MENDOZA-NAVA** in December 2018, **THANIA ROSALES** confirmed to Witness #8 that she had known **MENDOZA-NAVA** to be working for a narcotics trafficker. (NOTE: Evidence provided subsequently will establish probable cause that between August and December of 2018, the **JOSE ROSALES MLO** was sending numerous wire transfers to Mexico through **THANIA ROSALES** at **LOS ROSALES 2** on behalf of the **MENDOZA-NAVA DTO**.)

## EXPRESS CELLULAR - 4260 Eastland Square Dr., Columbus, OH 43232

49. Witness #2 is an admitted narcotics trafficker and a former member of a DTO that distributed Heroin in the Southern District of Ohio. Witness #2 participated in a ride along with investigators from HIDTA and directed them to each of the three stores known to be members of the **JOSE ROSALES MLO**. Witness #2 stated that the dark skinned Hispanic male at 1028 Shady Lane Rd., has another daughter named **"PUCHONA"** at 4260 Eastland Square Dr., Columbus, OH 43232. Witness #2's source of supply told Witness #2 that **"PUCHONA"** had wired money for the source of supply.

50. Witness #9 is a convicted narcotics trafficker and a former member of a DTO that distributed Heroin in the Southern District of Ohio. Witness #9 was directed by his/her source of Heroin to deliver cash to a Mexican store named **EXPRESS CELLULAR**. Witness #9 would give money to a woman or a man at the store. Witness #9 was shown photographs of **DULCE ROSALES** and **JOSUE GAMA** and identified them as the people he/she gave the money to at **EXPRESS CELLULAR**. Witness #9 knew **DULCE ROSALES** as **"POOCHIES"** (NOTE: Your Affiant is unsure of the proper spelling of this name). Witness #9 made a delivery to **EXPRESS CELLULAR** every week or every two weeks for several months beginning in July 2017. The money delivered by Witness #9 was divided into $1,000 stacks and then placed in a Ziploc bag. Witness #9 said that the couple charged $50 per $1,000 transferred.

51. Witness #10 is an admitted narcotics trafficker and a former member of a DTO that distributed Heroin in the Southern District of Ohio. In 2018 Witness #10 delivered a plastic bag containing approximately $20,000 to a cell phone shop near an apartment off Refugee Rd. Witness #10 didn't know the name of the business but it was near a Mexican grocery store. The individual he/she was working for instructed Witness #10 to take the money there. Witness #10 stated there was a male and female in the store and they were in charge of it. There was no conversation

between the individuals in the cell phone store and Witness #10 because they knew he/she was coming. Witness #10 handed the money to the female and turned around and left. (NOTE: **EXPRESS CELLULAR** is cell phone store near the corner of Refugee Rd., and Hamilton Rd., in Columbus, OH. **EXPRESS CELLULAR** is located in a strip mall near a Mexican grocery store.)

52. Witness #11 is a convicted narcotics trafficker and the former head of a DTO that distributed Heroin in the Southern District of Ohio. Witness #11 was instructed by one of his/her sources of Heroin to make contact with her (the woman from the store, **EXPRESS CELLULAR**). Witness #11 was instructed to take a shoe box that contained money to the woman at **EXPRESS CELLULAR**, and tell the woman that the shoes were for her. The source of the Heroin explained to Witness #11 that the woman already knew and would be waiting. The woman made up the names of the senders of the wire transfers. Witness #11 said that he/she made these cash deliveries once a week from approximately 2015 to 2017. The amount of cash delivered would normally be between $30,000 and $40,000. Witness #11 was shown photographs of **DULCE ROSALES** and **JOSUE GAMA** and identified them as the people he/she gave the money to at **EXPRESS CELLULAR**. Witness #11 mostly dealt with the female (**DULCE ROSALES**) but on five or six occasions Witness #11 dealt with the male (**JOSUE GAMA**). Witness #11 did not know **JOSUE GAMA's** real name or the true identity of **DULCE ROSALES**. Witness #11 only knew **DULCE ROSALES** as **"LA POOCHIES."** Witness #11 estimated that the total amount he/she gave to the woman and her husband exceeded $1,000,000. Witness #11 said that all the money was proceeds from drug trafficking and he/she was only one of the individuals using this business to transfer funds in this manner.

# <u>Anti-Money Laundering (AML) Training</u>

53. Wire transfer services generally require their agents to complete AML Training when they initially become agents and then once annually while they serve as agents. Personnel from Transfast Remittance, LLC (Transfast), Sigue Corporation (Sigue), and IDT Payment Services, Inc. (Boss Revolution), provided information about the AML Training they require their agents to complete. For varying periods of time since 2014, the **JOSE ROSALES MLO** has served as agents for the above wire transfer services as follows (NOTE: The following is not an exhaustive list):

    A. Transfast: **LOS ROSALES, LOS ROSALES 2,** and **EXPRESS CELLULAR**.

    B. Sigue: **LOS ROSALES, LOS ROSALES 2,** and **EXPRESS CELLULAR**.

    C. Boss Revolution: **LOS ROSALES 2** and **EXPRESS CELLULAR**.

54. The topics covered in the training provided to the **JOSE ROSALES MLO** would have included: Bank Secrecy Act, record keeping, structuring, willful blindness, how to detect suspicious activity, the definition of money laundering, and red flags.

55. Based on this training, members of the **JOSE ROSALES MLO** would have known it was a violation of the MSBs AML policies to structure transactions, utilize inaccurate sender information, conduct transactions for customers that were not physically present, and text photographs of receipts to customers.

56. The designated Compliance Officers for each **JOSE ROSALES MLO** store are as follows:

    A. **LOS ROSALES: JOSE ROSALES**

    B. **LOS ROSALES 2: THANIA ROSALES**

    C. **EXPRESS CELLULAR: JOSUE GAMA**

## Mendoza-Nava DTO

57. The **ELIEZAR MENDOZA-NAVA Drug Trafficking Organization (MENDOZA-NAVA DTO)** distributed Heroin in the Southern District of Ohio. **ELIEZAR MENDOZA-NAVA (MENDOZA-NAVA)** and **RODRIGO ESQUEDA-VASQUEZ (ESQUEDA-VASQUEZ)** both held leadership positions within the **MENDOZA-NAVA DTO**. Based on surveillance investigators believed that 5847 Garden Hill Lane, Dublin, OH, was being used as a stash house by the **MEDNDOZA-NAVA DTO**. On December 4, 2018, **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ** were arrested outside of 5847 Garden Hill Lane and charged with Trafficking in Drugs. During a subsequent search of the residence at 5847 Garden Hill Lane, conducted the same night that **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ** were arrested, approximately six kilograms of Heroin were discovered.

58. During the arrests of **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ** multiple cellular phones were seized. Subsequent searches of these phones revealed photos of hundreds of wire transfer receipts from the three cell phone stores that are members of the **JOSE ROSALES MLO: LOS ROSALES, LOS ROSALES 2**, and **EXPRESS CELLULAR**. In addition to the receipts, photos of lists containing names were also discovered on these phones. The names on these lists were also associated with wire transfers from the **JOSE ROSALES MLO** and will be explained further subsequently in this Affidavit. Between these lists and receipts, there is probable cause to believe the **JOSE ROSALES MLO**, conducted or attempted to conduct, approximately 300 wire transfers for the **MENDOZA-NAVA DTO**, totaling approximately $200,000, between September 27, 2018, and December 4, 2018.

59. Lastly, evidence gathered to date suggests that at certain points in 2018 **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ** may have been the main customers, or only customers, with respect to **THANIA ROSALES** and **LOS ROSALES 2**.

    A. A review of records provided by IDT Payment Services, Inc. (Boss Revolution) reveals that there were approximately 24 wire transfers originated from **LOS ROSALES 2** between October 5, 2018, and October 11, 2018. All of these wire transfers from **LOS ROSALES 2** through Boss Revolution can be linked to **ESQUEDA-VASQUEZ**.

    B. A review of records provided by Boss Revolution reveals that there were approximately 68 wire transfers originated from **LOS ROSALES 2** between November 18, 2018, and November 27, 2018. During this same time frame, approximately 61 wire transfers originated from **LOS ROSALES 2** through BOSS Revolution that can be linked to **MENDOZA-NAVA**.

## **Altered Receipts**

60. The photos of the wire transfer receipts recovered from the cellular phones of **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ** did not include the name of the wire transfer service or the name of the agent (e.g. **LOS ROSALES**). In many instances, it appeared the receipts were altered, specifically by cutting them, to conceal this information.

61. The **JOSE ROSALES MLO** utilized various wire transfer services to conduct the wire transfers associated with the photos of receipts found on the cellular phones of **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ**. The wire transfer services utilized by the **JOSE ROSALES MLO** included: Omnex Group, Inc. (Omnex), Transfast, Girosol Corp. (Girosol), Sigue, and Boss Revolution. Example receipts were obtained from all of these wire transfer services. Unlike the receipts recovered from the phones of **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ**, all of

the example receipts provided by these wire transfer services included the name of the wire transfer service and the name of the agent.

62. On multiple occasions in 2019, **JUAN RODRIGUEZ-JIMENEZ (RODRIGUEZ-JIMENEZ)** was observed entering **EXPRESS CELLULAR** at 4260 Eastland Square Dr., Columbus, OH. On February 14, 2019, **RODRIGUEZ-JIMENEZ** was arrested in Columbus, OH, and a search warrant was conducted on his residence. During the search of the residence a plastic bag was located that contained approximately 290 grams of Heroin. During the arrest of **RODRIGUEZ-JIMENEZ**, two cell phones were seized. A subsequent search of these cell phones revealed several photos of what appear to be gallon size plastic bags filled with a brown substance being weighed on a digital scale. Further, these cell phones were found to contain approximately 13 wire transfer receipts. (NOTE: One of these was a text message that contained an MTCN number.) All of the wire transfer receipts in the phone of **RODRIGUEZ-JIMENEZ** were for transfers initiated at **EXPRESS CELLULAR**. **JUAN RODRIGUEZ-JIMENEZ** is not listed as the sender for any of the wire transfers associated with the receipts found on his phone. Most of these receipts correspond to transfers that list a "Receiver State" of "Nayarit," a state in Mexico that, according to experience, Your Affiant knows to be a significant source of supply for drug trafficking activity in Ohio. Additionally, these receipts appear to be altered. Lastly, these 13 wire transfers were accomplished using eight different sender addresses. Each of these eight addresses were entered into the search feature of the Franklin County Auditor's website and all returned the result: "Your search did not find any records."

63. The receipts associated with **RODRIGUEZ-JIMENEZ** appear to have been altered in a manner similar to the receipts associated with **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ**. Law enforcement is unaware of any connection between **RODRIGUEZ-**

**JIMENEZ** and either **MENDOZA-NAVA** or **ESQUEDA-VASQUEZ**. Additionally, the 13 receipts in the phone of **RODRIGUEZ-JIMENEZ** can be traced to wire transfers that occurred after the arrests of **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ**. This evidence suggests that the **JOSE ROSALES MLO** is altering these receipts as opposed to the narcotics traffickers.

## Lists

64. Representatives from various wire transfer services were contacted to determine: 1.) If there was any interaction between a customer and an agent that did not happen in person; and 2.) If cash could be left with an agent to be wired at a different time or location. The below guidance was provided by the respective wire transfer services:

    A. Transfast: All interaction happens on the spot, at the time of the transaction. Customers can't leave cash to be wired later.

    B. Girosol: "The answer to both questions is no. We make particular emphasis on this. Transactions occur with the client presenting themselves in person to our agencies."

    C. Omnex: "All customer transactions with agents are done in person with one exception. WireCash is a new agent that operates solely online. Those transactions are made using credit cards and debit cards and are made through traditional merchant processors between banks. No, customers cannot leave cash with an agent for transmission at a later time. We do not allow that activity."

    D. Sigue: "Our answer to both of your questions is 'No'."

    E. Boss Revolution: All interactions should be in person. If a customer has opted in to receive receipts via text message then the system will automatically provide these. Agents are not supposed to be taking pictures of receipts and texting them to customers. Leaving cash with an agent to be wired at a different time or location is not a practice

accepted or encouraged. Some agents engage in this practice and it is hard to monitor and to enforce.

65. In addition to the photos of wire transfer receipts found on the cellular phones of **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ**, at least three photos of hand written lists were also found. These photos of the three lists were each found on different cellular telephones and all contained names. One of the lists contained approximately 24 names. Another of the lists contained eight names. A third list, titled "NAYARIT," contained 26 names. (NOTE: Nayarit is a small state in western Mexico known by your Affiant to be a significant source of Heroin to the United States and specifically Columbus, OH.)

66. The list that contained approximately 24 names (NOTE: the last name on this list is only partially visible) was found on a cellular phone seized during the arrest of **ESQUEDA-VASQUEZ**. The names on the list of 24 names were compared with wire transfers from the three stores known to be members of the **JOSE ROSALES MLO**. This comparison revealed that all of the names on the list were intended as beneficiaries of wire transfers from the **JOSE ROSALES MLO**. Further, the first 11 names on the list were intended as beneficiaries of wire transfers from **EXPRESS CELLULAR** on October 6, 2018. The second 13 names were listed as beneficiaries of wire transfers from **LOS ROSALES** on October 9, 2018.

67. The list that contained eight names was found on a cellular phone seized during the arrest of **ESQUEDA-VASQUEZ**. The cellular phone that contained the list of eight names was not on the same cellular phone that contained the list of 24 names. The names on the list that contained eight names were compared with wire transfers from the three stores known to be members of the **JOSE ROSALES MLO**. This comparison revealed that all of the names on the list were intended as beneficiaries of wire transfers from **LOS ROSALES** on November 13, 2018.

Further, these eight wire transfers were initiated in under an hour and utilized three different wire transfer services.

68. The list titled "NAYARIT" that contained approximately 26 names was found on a cellular phone seized during the arrest of **MENDOZA-NAVA**. The 26 names on the list titled "NAYARIT" were compared with wire transfers from the three stores known to be members of the **JOSE ROSALES MLO**. This comparison revealed that all of the names on the "NAYARIT" list were beneficiaries of wires from target locations (NOTE: The list contained the name J. Jesus Sandoval Gonzalez; the beneficiary that corresponds to this name includes a particle and is listed as J De Jesus Sandoval Gonzalez.) Further, the first 13 names on the "NAYARIT" list were intended as beneficiaries of wire transfers from **EXPRESS CELLULAR** on November 19, 2018. Names 14-26 on the "NAYARIT" list were intended as beneficiaries of wire transfers from **LOS ROSALES 2** on November 20, 2018.

## Lists from November 20, 2018

69. On November 20, 2018, investigators assigned to the investigation of the **JOSE ROSALES MLO** conducted surveillance on **LOS ROSALES 2**, located at 4340 East Main St., Suite A, Columbus, OH 43213. (NOTE: As previously detailed, on November 20, 2018, 13 wire transfers were initiated from **LOS ROSALES 2** that were intended for beneficiaries named on the "NAYARIT" list. The previous day, November 19, 2018, 13 wire transfers were initiated from **EXPRESS CELLULAR** that were intended for beneficiaries named on the "NAYARIT" list.) Investigators observed the following:

    A. **1:58 PM MENDOZA-NAVA** arrives and a vehicle associated with **THANIA ROSALES** was parked out front.

    B. **2:12 PM MENDOZA-NAVA** left.

    C. **3:45 PM THANIA ROSALES** threw away trash.

    D. **3:48 PM DULCE ROSALES** arrived at 4340 East Main St., and entered the business empty handed. **DULCE ROSALES** left almost immediately with what appeared to be a blue bag in her hand.

    E. **4:52 PM** An investigator retrieved the trash thrown away by **THANIA ROSALES**. The trash contained 58 rubber bands as well as a bank band labeled $1,000.

70. Approximately one of the 13 wire transfers on November 20, 2018, initiated from **LOS ROSALES 2**, intended for beneficiaries named on the "NAYARIT" list, occurred between 1:58 PM and 2:12 PM. Surveillance shows **MENDOZA-NAVA** present at 4340 East Main St., during this time frame.

71. Approximately five of the 13 wire transfers on November 20, 2018, initiated from **LOS ROSALES 2**, intended for beneficiaries named on the "NAYARIT" list, occurred between 2:12 PM and 5:00 PM. Surveillance shows **MENDOZA-NAVA** absent at 4340 East Main St., during this time frame.

## Global Positioning System Information

72. On October 29, 2018, investigators installed a Global Positioning System (GPS) unit on a Volkswagen Jetta, known to be driven by **MENDOZA-NAVA**, Ohio license plate HOT-5623. On November 9, 2018, investigators installed a GPS unit on a Chevy Malibu, Ohio license plate HOC-8021, known to be driven by **ESQUEDA-VASQUEZ**. On December 4, 2018, investigators installed a GPS unit on a Ford Fusion, Ohio license plate HKR-4026, known to be driven by **ESQUEDA-VASQUEZ**.

    A. In an attempt to determine when any of the above vehicles was at **LOS ROSALES 2**, a review of GPS tracks was conducted using the search function on Microsoft Excel for the

following key words: E. Main, 4340. The Chevy Malibu and the Ford Fusion showed no results. The Volkswagen Jetta showed results on the following dates:

  i.   November 2, 2018
  ii.  November 3, 2018
  iii. November 12, 2018
  iv.  November 18, 2018
  v.   November 19, 2018
  vi.  November 20, 2018
  vii. November 23, 2018
  viii. November 30, 2018
  ix.  December 3, 2018

B. In an attempt to determine when any of the above vehicles was at **LOS ROSALES**, a review of GPS tracks was conducted using the search function on Microsoft Excel for the following key words: Shady Lane, Shady, 1028. No results were shown for any of the vehicles equipped with GPS units.

C. In an attempt to determine when any of the above vehicles was at **EXPRESS CELLULAR**, a review of GPS tracks was conducted using the search function on Microsoft Excel for the following key words: Eastland, Square, Eastland Square. No results were shown for any of the vehicles equipped with GPS units.

## Fictitious Addresses

73. Investigators attempted to determine the accuracy of the sender information listed on wire transfers from member stores of the **JOSE ROSALES MLO.** To do so, sender information related to the three lists found on the phones of **MENDOZA-NAVA** and **ESQUEDA-VASQUEZ** was analyzed (described previously). These lists represent a total of 58 wire transfers.

74. Of the 58 sender names represented on these three lists, none are **ELIEZAR MENDOZA-NAVA** or **RODRIGO ESQUEDA-VASQUEZ**. Further, of the 58 names listed as senders, 56 are only used once.

75. The **JOSE ROSALES MLO** utilized 56 unique sender addresses to initiate the 58 wire transfers associated with the three lists. These 56 addresses were entered into the search feature of the Franklin County Auditor's website and approximately 35 returned the result: "Your search did not find any records". Additionally, the sender addresses listed by the **JOSE ROSALES MLO** that returned results included the 979 S. James Rd. (Columbus Montessori Education Center), 2210 E. Livingston Ave. (Peking Dynasty), and 2387 E. Main St. (Congregation Torat Emet). (NOTE: To verify the results obtained through the Franklin County Auditor's website, Google searches were also conducted on the addresses that returned the result: "Your search did not find any records." These Google searches identified approximately three additional addresses that appear to exist.)

## Julio Angel Homer Gonzalez

76. On multiple occasions in 2018, **JULIO ANGEL HOMER GONZALEZ (GONZALEZ)** and **RODOLFO FRANCO-VALDEZ (FRANCO-VALDEZ)** were observed entering **LOS ROSALES** at 1028 Shady Lane Rd., Columbus, OH. On September 26, 2018, search warrants were conducted on residences associated with **GONZALEZ** and **FRANCO-VALDEZ**. During the course of these search warrants approximately 76 grams of Fentanyl and approximately 226 pounds of Marijuana were discovered. Additionally, numerous calendars and handwritten notes were located that detailed dates and names. Investigators were able to link these dates and names with wire transfers from **LOS ROSALES** to beneficiaries in Mexico.

77. There is probable cause to believe that between 2015 and 2018, the **JOSE ROSALES MLO** conducted approximately 300 wire transfers from the Southern District of Ohio to Mexico on behalf of **GONZALEZ** and **RODOLFO FRANCO-VALDEZ**. The majority of these transfers were originated from **LOS ROSALES** but on more than one occasion these transfers were initiated from **LOS ROSALES 2**.

78. **GONZALEZ** was previously arrested on May 21, 2015, in connection with a seizure of approximately 476 grams of Methamphetamine.

## Juan Rodriguez-Jimenez

79. On multiple occasions in 2019, **JUAN RODRIGUEZ-JIMENEZ (RODRIGUEZ-JIMENEZ)** was observed entering **EXPRESS CELLULAR** at 4260 Eastland Square Dr., Columbus, OH. On February 14, 2019, **RODRIGUEZ-JIMENEZ** was arrested in Columbus, OH, and a search warrant was conducted on his residence. During the search of the residence a plastic bag was located that contained approximately 290 grams of Heroin. During the arrest of **RODRIGUEZ-JIMENEZ**, two cell phones were seized. A subsequent search of these cell phones revealed several photos of what appear to be gallon size plastic bags filled with a brown substance being weighed on a digital scale. Further, these cell phones were found to contain approximately 13 wire transfer receipts. (NOTE: One of these was a text message that contained an MTCN number.) All of the wire transfer receipts in the phone of **RODRIGUEZ-JIMENEZ** were for transfers initiated at **EXPRESS CELLULAR**. **JUAN RODRIGUEZ-JIMENEZ** is not listed as the sender for any of the wire transfers associated with the receipts found on his phone. Most of these receipts correspond to transfers that list a "Receiver State" of "Nayarit," a state in Mexico that, according to experience, Your Affiant knows to be a significant source of supply for drug trafficking activity in Ohio. Additionally, these receipts appear to be altered. Lastly, these 13

wire transfers were accomplished using eight different sender addresses. Each of these eight addresses were entered into the search feature of the Franklin County Auditor's website and all returned the result: "Your search did not find any records."

## Video Surveillance

80. Law enforcement established video surveillance on the front doors of the three stores known to members of the **JOSE ROSALES MLO**. This video surveillance provided law enforcement the opportunity to compare the arrival and exit of individuals to the physical store locations, with the wire transfers being sent from these stores. Below are examples of what investigators observed (all times approximate):

A. On February 14, 2018, approximately no individuals entered or exited the front door of **EXPRESS CELLULAR** between 5:35-5:55 PM (All times Eastern Standard). During the same time frame **EXPRESS CELLULAR** utilized Transfast to conduct approximately three wire transfers to Mexico.

B. On March 7, 2018, at 9:12 AM, a white Sport Utility Vehicle (SUV) parked in front of **EXPRESS CELLULAR**. The driver of this vehicle appears to unlock the front door of **EXPRESS CELLULAR** and then enter the business. Other than the driver of the previously mentioned SUV, approximately no individuals entered or exited the front door of **EXPRESS CELLULAR** between 9:12-9:45 AM. During the same time frame **EXPRESS CELLULAR** utilized Omnex to conduct approximately four wire transfers to Mexico.

C. On March 17, 2018, approximately no individuals entered or exited the front door of **EXPRESS CELLULAR** between 2:45-3:20 PM. During the same time frame

**EXPRESS CELLULAR** utilized Transfast, Omnex, and Boss Revolution to conduct approximately eight wire transfers to Mexico.

D. On March 18, 2018, at 9:57 AM, a white SUV parked in front of **EXPRESS CELLULAR**. The driver of this vehicle appears to unlock the front door of **EXPRESS CELLULAR** and then enter the business. Other than the driver of the previously mentioned SUV, approximately no individuals entered or exited the front door of **EXPRESS CELLULAR** between 9:57-10:15 AM. During the same time frame **EXPRESS CELLULAR** utilized Omnex to conduct approximately three wire transfers to Mexico.

E. On August 24, 2018, approximately three individuals entered, and three individuals exited the front door of **LOS ROSALES**, 1028 Shady Lane Rd., Columbus, OH 43227, between 9:45-10:55 AM (All times Eastern Standard). During the same time frame **LOS ROSALES** utilized Sigue, Girosol, and Omnex, to conduct approximately 13 wire transfers to Mexico.

F. On September 7, 2018, approximately no individuals entered, and two individuals exited the front door of **LOS ROSALES**, 1028 Shady Lane Rd., Columbus, OH 43227, between 12:20-1:25 PM. During the same time frame **LOS ROSALES** utilized Sigue, Girosol, and Omnex, to conduct approximately 12 wire transfers to Mexico. (NOTE: One of the individuals that exited appears to be **JOSE ROSALES**. This individual appears to exit, re-enter the store, and then exit again.)

G. On September 11, 2018, approximately no individuals entered, and approximately one individual exited the front door of **LOS ROSALES** 1028 Shady Lane Rd., Columbus, OH 43227, between 11:30-12:05 PM. During the same time frame **LOS ROSALES**

utilized Sigue, Girosol, and Omnex, to conduct approximately 10 wire transfers to Mexico.

H. On September 22, 2018, approximately two individuals entered, and three individuals exited the front door of **LOS ROSALES**, 1028 Shady Lane Rd., Columbus, OH 43227, between 6:45-8:00 PM. During the same time frame **LOS ROSALES** utilized Sigue, Girosol, and Omnex, to conduct approximately 13 wire transfers to Mexico.

I. On March 28, 2019, at 8:34 AM, a black SUV parked in front of **LOS ROSALES 2** (4340 East Main St., Suite A, Columbus, OH 43213). The driver of this vehicle appears to unlock the front door of **LOS ROSALES 2** and then enter the business. (NOTE: The driver of the vehicle appears to be **THANIA ROSALES**). Other than the driver of the previously mentioned SUV, approximately no individuals entered or exited the front door of **LOS ROSALES 2** between 8:35-8:52 AM. During the same time frame **LOS ROSALES 2** utilized Boss Revolution to conduct approximately three wire transfers to Mexico.

J. On March 30, 2019, at 12:32 PM, a black SUV parked in front of **LOS ROSALES 2** (4340 East Main St., Suite A, Columbus, OH 43213). The driver of this vehicle appears to unlock the front door of **LOS ROSALES 2** and then enter the business (NOTE: The driver of the vehicle appears to be **THANIA ROSALES**). Other than the driver of the previously mentioned SUV, approximately no individuals entered or exited the front door of **LOS ROSALES 2** between 12:33-12:52 PM. During the same time frame **LOS ROSALES 2** utilized Boss Revolution to conduct approximately three wire transfers to Mexico.

81. Additionally, Your Affiant is aware that legitimate businesses utilize signage, for the purposes of alerting potential customers that the business exists and identifying its location. During the course of this investigation Your Affiant was unable to identify any signage that declared **LOS ROSALES 2** was conducting business from 4340 East Main St., Suite A, Columbus, OH 43213.

## Wire Transfer Services

82. Several wire transfer services have discontinued their business relationships with member stores of the **JOSE ROSALES MLO**. The reason these wire transfer services no longer utilize these agents is based on the characteristics of the wire transfers conducted by these stores.

### Intermex-LOS ROSALES

83. **LOS ROSALES** previously served as an agent for Intermex Wire Transfer, LLC (Intermex). The Agency Application provided by Intermex for LOS ROSALES is dated February 24, 2014, and signed by **"JOSE LUIS ROSALES."** This application lists **"JOSE LUIS ROSALES"** as an "Owner" of **LOS ROSALES** and lists his ownership percentage as "100." Intermex identified 25 transactions that were completed through **LOS ROSALES** and another agent. (NOTE: It was determined through the course of this investigation that the other agent was unrelated to the **JOSE ROSALES MLO**.) These transactions were completed on June 25, 2014; September 21, 2014; and October 31, 2014. According to Intermex, these transactions were suspicious for the following reasons:

    A. There were consecutive transactions under a $1,000.

    B. Time and date of the transactions make them appear to be a cluster of transactions.

    C. Customers that have no history with Intermex.

    D. Senders with no apparent relationship with the beneficiary.

    E. High dollar amounts.

F. Transactions with Tepic, Nayarit; an area on the money laundering radar.

84. Intermex called all of the senders of these wire transfers and the numbers were either disconnected, out of service, or did not belong to the customers.

85. Intermex conducted a second investigation involving only **LOS ROSALES**. This investigation involved 196 individuals that conducted 216 transactions between September 1, 2015, and October 19, 2015. The wires in the second investigation were similar to the first but the amounts of the wires were lower and the senders appeared to be related. Most of the phone numbers for the senders were disconnected or wrong.

86. Intermex conducted a third investigation and this one only involved **LOS ROSALES**. This investigation involved 28 individuals that conducted 34 transactions. The amounts of these transactions ranged from $470-$1,300. The filter that was in place asked customers for identification and proof of income. Normally this information would only be requested for transactions of $2,000 or more but the filter established a lower threshold. Eight of the 34 transactions were cancelled by the customers. Some of the phone numbers for the senders were wrong or disconnected.

87. The results of these investigations were presented to the compliance department and it was determined that it was too high risk to continue the relationship with **LOS ROSALES**.

88. During the course of this investigation, Intermex provided a copy of the termination letter sent to **LOS ROSALES**. This letter stated in part: "Pursuant to and under the authority of the Agency Agreement between **JOSE LUIS ROSALES LLC** (OH-0178) and Intermex Wire Transfer. LLC ("Intermex"), we hereby inform you that effective today April 18, 2016 your agency agreement has been terminated. We have reviewed your business activity with Intermex, and

have determined that your Company's risk profile does not meet Intermex's current operating guidelines."

## Transfast-LOS ROSALES and LOS ROSALES 2

89. **JOSE LUIS ROSALES LLC DBA LOS ROSALES (LOS ROSALES)** was Transfast agent OH0184 and started as an agent in October 2014. **LOS ROSALES** was located at 1028 Shady Lane Rd. in Columbus, OH. **LOS ROSALES 2 LLC DBA LOS ROSALES 2 (LOS ROSALES 2)** was Transfast agent OH0256 and started as an agent in November 2016. **LOS ROSALES 2** was located at 3307 E. Main St. in Columbus, OH (NOTE: the store's previous address). **JOSE LUIS ROSALES OCAMPO (JOSE ROSALES)** cosigned for **LOS ROSALES 2** with his daughter **THANIA ROSALES GUADARRAMA (THANIA ROSALES)**.

90. An investigation was conducted by Transfast on a sample of transactions conducted by **LOS ROSALES** from April 3, 2017-July 20, 2017. This sample contained 54 transactions conducted by **JOSE ROSALES** and others, to Diego Rosales Guadarrama in Ixtapan de la Sal, Mexico. These 54 transactions totaled $8,520. During this same time frame, these same senders sent $34,083 to other beneficiaries in Mexico.

91. Transfast thought this might be an attempt to avoid their internal threshold of $20,000 in 180 days so they requested additional documents. Compliance tried to call these senders but none of the phone numbers worked except the one for **JOSE ROSALES**.

92. A representative from Transfast went to **LOS ROSALES** on July 31, 2017, to conduct an on-site review. This representative provided a list of transactions and requested documentation on all the senders. This information was never provided.

93. On August 3, 2017, Transfast called and emailed **LOS ROSALES** again.

94. A second representative from Transfast, went to **LOS ROSALES** on August 10, 2017, with a new list of transactions and requested documentation on the senders.

95. On August 18, 2017, the second representative from Transfast made a second visit to **LOS ROSALES** and the documentation was not produced. According to Transfast, **JOSE ROSALES** had basically communicated that he had not gathered the documentation and wasn't going to.

96. On August 31, 2017, **LOS ROSALES** was closed as an agent. This was done through a formal communication and **JOSE ROSALES** was supposed to sign this letter and return it.

97. Transfast noticed that customers from their review of **LOS ROSALES** were also customers of **LOS ROSALES 2**.

98. Transfast has no record of ever reaching out to **THANIA ROSALES**.

99. **LOS ROSALES 2** was closed August 31, 2017.

## RIA Financial-EXPRESS CELLULAR

100. **EXPRESS CELLULAR** served as an agent for RIA Financial Services (RIA Financial) from 2013 to 2015. The Agent Trust Agreement provided by RIA Financial lists **"DELCY N BONILLA"** as the "Owner" of **"EXPRESS CELLULAR Y MAS LLC."**

101. RIA Financial observed that **EXPRESS CELLULAR** was involved in numerous transactions with the Mexican states of Jalisco, Nayarit, and Michoacán. Nayarit is a state in Mexico that, according to experience, Your Affiant knows to be a significant source of supply for drug trafficking activity in Ohio. RIA Financial further observed that many of the transactions conducted by **EXPRESS CELLULAR** were between $900-$950. RIA Financial requires identification information for transactions that equal $1,000. RIA Financial attempted to contact the individuals that were supposed to be the customers but were unable to do so. The telephone numbers that had been provided were bad, or disconnected, or the individuals who

answered said they didn't send the wire associated with the phone number. RIA Financial placed a "filter" on all transactions from **EXPRESS CELLULAR** that were for amounts between $750-$999. This filter requested a copy of the Sender identification, purpose of the transaction, and relationship with the Beneficiary. Once this filter was in place, **EXPRESS CELLULAR** decreased monthly transactions from approximately 100, to about eight or nine. **EXPRESS CELLULAR** called RIA Financial and was nervous. (NOTE: It is not known who actually placed this phone call.) RIA Financial instructed **EXPRESS CELLULAR** that customer information needed to be confirmed. **EXPRESS CELLULAR** was angry and said that the customers don't need to provide information. **EXPRESS CELLULAR** represented that they didn't care about the RIA Financial policy of Know Your Customer or the personal lives of the customer. **EXPRESS CELLULAR** represented that they only cared about doing business. **EXPRESS CELLULAR** was informed by letter that RIA Financial no longer wanted to maintain the business relationship.

## Sigue-EXPRESS CELLULAR

102.　　　**EXPRESS CELLULAR** previously served as an agent for Sigue. The Master Trust Agreement provided by Sigue is dated November 5, 2015, and signed by **"JOSUE GAMA PEREZ"** as a "Member" of **"EXPRESS CELLULAR Y MAS LLC."** An investigation was conducted by Sigue and consisted of analyzing 375 wire transactions sent from **EXPRESS CELLULAR** between March and August 2017. The investigation revealed that six indicators of wire transfers related to narcotics trafficking were present. Sigue provided the following:

A. 64% of the transactions were sent to the Mexican state of Nayarit. Nayarit is considered a high risk state.

B. The Sigue typology includes transactions between $800-$999. In the experience of Sigue and their consultant, transactions that involve narcotics proceeds are often for amounts in this range. Many of the **EXPRESS CELLULAR** transactions that were analyzed were in this dollar range.

C. In Mexico, beneficiaries will be asked for more identification for transactions of $1,000 or more. The activity at **EXPRESS CELLULAR** made it seem possible that large amounts of money were being broken up into smaller amounts. Additionally, Elektra and Bancoppel were the receiving agents on 86% of the analyzed transfers. Based on all the facts, it's unusual that these two institutions would receive this percentage of the transfers. Elektra and Bancoppel provide more flexibility for the receiver because they are prevalent in Mexico. Sigue would expect to see a higher percentage of "Mom and Pop" agents receiving these transactions.

D. It's possible that one person is orchestrating these transactions or a group of people might be working together to avoid Currency Transaction Reports (CTR).

E. The majority of the recipients are in high risk drug trafficking regions.

F. Beneficiaries are receiving money from people who don't share their last name.

103. At the conclusion of this investigation it was determined that the relationship with **EXPRESS CELLULAR** should be terminated for compliance reasons. This occurred in November of 2017.

## Sales and Income

104. Investigators assigned to this investigation obtained sales tax records from the State of Ohio to better understand the business operations of the **JOSE ROSALES MLO**. Your Affiant

is aware that a wire transfer is not an exchange of personal property and therefore would not require sales tax to be collected.

    A. According to records obtained from the State of Ohio, between December 2016 and November 2018, **LOS ROSALES** had approximately $56,000 in total sales that required sales tax to be collected.

    B. According to records obtained from the State of Ohio, between December 2016 and July 2018, **LOS ROSALES 2** had approximately $26,000 in total sales that required sales tax to be collected.

    C. According to records obtained from the State of Ohio, between January 2017 and September 2018, **EXPRESS CELLULAR** had approximately $13,000 in total sales that required sales tax to be collected. Further, there were approximately seven months during this time span in which **EXPRESS CELLULAR** reported taxable sales amounts of $0.00

105. Investigators assigned to this investigation obtained income tax records from the Internal Revenue Service (IRS) to better understand the income and expenses of the **JOSE ROSALES MLO**. Your Affiant is aware that individuals involved in criminal activity often do not report the proceeds of their illicit activity on federal income tax forms.

    A. Income and expenses from **LOS ROSALES** are claimed on a Profit or Loss From Business (Sole Proprietorship) Schedule C ( Schedule C) as part of the U.S. Individual Income Tax Return Form 1040 (Form 1040) filed for **JOSE LUIS ROSALES-OCAMPO (JOSE ROSALES)**. According to records obtained from the IRS, the below table reflects the income from **LOS ROSALES** as well as the Total Income for **JOSE ROSALES**:

| Year | LOS ROSALES Income | Total Income |
|---|---|---|
| 2013 | NA | $ 30,210.00 |
| 2014 | $ 11,263.00 | $ 11,263.00 |
| 2015 | $ 10,324.00 | $ 10,324.00 |
| 2016 | $ 10,258.00 | $ 10,258.00 |
| 2017 | $  6,825.00 | $  6,825.00 |
| Totals | $ 38,670.00 | $ 68,880.00 |

B. Income and expenses from **LOS ROSALES 2** are claimed on a Schedule C  as part of the Form 1040 filed for **THANIA ROSALES-GUADARRAMA (THANIA ROSALES)**. According to records obtained from the IRS, the below table reflects the income from **LOS ROSALES 2** as well as the Total Income for **THANIA ROSALES**:

| Year | LOS ROSALES 2 Income | Total Income |
|---|---|---|
| 2013 | NA | $5,594.00 |
| 2014 | NA | $14,922.00 |
| 2015 | NA | $14,850.00 |
| 2016 | $1,847.00 | $3,961.00 |
| 2017 | $11,482.00 | $11,482.00 |
| Totals | $13,329.00 | $50,809.00 |

C. Income and expenses from **EXPRESS CELLULAR** are claimed on a Schedule C as part of the Form 1040 filed for **JOSUE GAMA-PEREZ (JOSUE GAMA)**. According to

records obtained from the IRS, the below table reflects the income from **EXPRESS CELLULAR** as well as the Total Income for **JOSUE GAMA**:

| Year | EXPRESS CELLULAR Income | Total Income |
|------|------------------------|--------------|
| 2013 | $ (2,259.00) | $ 21,896.00 |
| 2014 | $ 14,281.00 | $ 22,097.00 |
| 2015 | $ 15,252.00 | $ 29,159.00 |
| 2016 | $ 276.00 | $ 18,995.00 |
| 2017 | $ (4,245.00) | $ 3,258.00 |
| Totals | $ 23,305.00 | $ 95,405.00 |

D.  For tax years 2015-2017, the Forms 1040 filed for **JOSUE GAMA** utilize the status: Married Filing Separate. **"DULCE BONILLA"** is listed as the spouse. A search was conducted using the taxpayer identification number listed for **"DULCE BONILLA"** on the 2017 Form 1040 filed for **JOSUE GAMA**. The search yielded no results. In summary Your Affiant was unable to locate a Form 1040 that claimed any income earned by **DULCE ROSALES** for tax years 2013-2017.

## Asset Accumulation

106.    Several members of the **JOSE ROSALES MLO** have acquired assets and have significant banking activity. Your Affiant is aware that the sudden accumulation of unexplained wealth is one indicator of criminal activity. (NOTE: Several of these asset acquisitions are not easily explainable based on the income tax filings previously discussed. These purchases would more than likely have required an additional source of funds.)

107.     Between 2015 and 2017, cash deposits to bank accounts under the control of **DULCE ROSALES** exceeded $100,000.

108.     Between 2016 and 2017, deposits of cash and money orders to bank accounts under the control of **THANIA ROSALES** exceeded $80,000.

109.     **JOSUE GAMA** and **DULCE ROSALES** purchased the residence at 720 Preston Trails Dr., Pickerington, OH 43147, for the Contract Sales Price of $189,000, on December 2, 2016. This purchase was completed with four cashier's checks and therefore no mortgage was taken on the property. The largest of the four checks used to purchase this property was drawn directly from the **EXPRESS CELLULAR** business account at Chase Bank (#556909302) in the amount of $74,000. (NOTE: It appears this check was purchased with a withdrawal of $65,000 and $9,000 in cash.) The other three checks used to facilitate the purchase of this home were all drawn on different accounts under the control of **JOSUE GAMA** and **DULCE ROSALES**. The chart below details the four checks used to complete the sale of 720 Preston Trails Dr., Pickerington, OH 43147.

| Check # | Amount | Account # | Account Name | Bank |
|---|---|---|---|---|
| 2011294435 | $ 35,000.00 | 1893101005 | Windows and Houses | HNB |
| 2011294436 | $ 35,000.00 | 2894029868 | JOSUE GAMA | HNB |
| 2011294437 | $ 43,173.75 | 2894766697 | DULCE ROSALES | HNB |
| 9075012057 | $ 74,000.00 | 556909302 | EXPRESS CELLULAR | Chase |
| | $ 187,173.75 | | | |

110.     **THANIA ROSALES** and Luis Alcauter-Alcauter purchased the residence at 3470 Oak Bend Blvd., Canal Winchester, OH 43110, for the Sales Price of $100,000, in May of 2017. The purchase price for 3470 Oak Bend Blvd., Canal Winchester, OH 43110, was paid in full through four wire transfers. Two of the wire transfer came from bank accounts under the control of

**THANIA ROSALES**. The two wire transfers from the bank accounts under the control of

**THANIA ROSALES** were conducted on May 17, 2017, for the following amounts:

    A. $18,000; JP Morgan Chase Bank Account 123716960

    B. $14,600; 5th 3rd Bank Account 7974766151

111.    **JOSUE GAMA** purchased a 2017 Acura MDX (VIN: 5FRYD4H54HB026577) in

August of 2017. A down payment of $17,000 was made to purchase this vehicle and

approximately $33,000 was financed. At the time of purchase the monthly payment amount on

this vehicle was approximately $932. The paperwork provided to your Affiant in connection with

the purchase of this vehicle lists the gross annual income for **JOSUE GAMA** as $65,000 and his

occupation is: "Owner Cell Phone Store".

## Statistical Analysis

112.    According to an Arizona Attorney General Intelligence Report: "Approximately **80%** of

all person to person MSB money transfers globally are below $500 each. The average MSB

money transfer sent from the United States to Latin American countries is below $400. A very

large majority of the tens of millions of yearly person to person money transfers below $500

each are related to family maintenance while experience has shown the remaining 20% of global

person to person transfers of $500 and greater have a much higher correlation with organized

illegal activity".

113.    Between December 15, 2016, and March 20, 2019, **LOS ROSALES** utilized Sigue to

initiate approximately 11,466 wire transfers. The below statistics are derived from these 11,466

transfers (all numbers and percentages approximate; fees not included):

    A. 838 of these transfers were intended for countries other than Mexico. The average

       amount of these transfers was $259.

B. 87 transfers intended for Mexico were for amounts of $1,000 or more.

C. 10,541 transfers intended for Mexico for amounts less than $1,000. The average amount of these transfers is $618.

D. Further, of the 10,541 transfers intended for Mexico, 3,569 listed NAYARIT as the "Paying Agent State". The average amount of these 3,569 wire transfers is $789.

114. **Based on this, and other similar data regarding LOS ROSALES, there is probable cause to believe that between 2014 and the present, LOS ROSALES has utilized various wire transfer services, to initiate wire transfers to Mexico, in amounts between $600-$999, totaling approximately $20,000,000.**

115. Between February 15, 2018, and May 20, 2019, **LOS ROSALES 2** utilized Boss Revolution to initiate approximately 2,198 wire transfers. The below statistics are derived from these 2,198 transfers (all numbers and percentages approximate; fees not included):

A. Two of these transfers were intended for countries other than Mexico.

B. 147 transfers intended for Mexico were not paid for various reasons.

C. 2,049 were paid in Mexico. Of the 2,049 paid in Mexico, the largest amount of a single wire transfer was $990.00 and the average amount of these transfers is $726.

D. Further, of the 2,049 transfers paid in Mexico, 717 list a "Recipient State" of NAYARIT. The average amount of these 717 wire transfers is $800.

116. **Based on this, and other similar data regarding LOS ROSALES 2, there is probable cause to believe that between 2016 and the present, LOS ROSALES 2 has utilized various wire transfer services, to initiate wire transfers to Mexico, in amounts between $600-$999, totaling approximately $4,000,000.**

117.     Between April 18, 2015, and March 11, 2019, **EXPRESS CELLULAR** utilized

Transfast to initiate approximately 11,667 wire transfers. The below statistics are derived from

these 11,667 transfers (all numbers and percentages approximate; fees not included):

  A.  921 of these transfers were intended for countries other than Mexico. The average

  amount of these transfers was $267.

  B.  570 transfers intended for Mexico were not paid.

  C.  206 transfers paid in Mexico were for amounts of $1,000 or more.

  D.  9,970 transfers were paid in Mexico for amounts less than $1,000. The average amount of

  these transfers is $709.

  E.  Further, of the 9,970 transfers paid in Mexico, 5,134 listed NAYARIT as the "State"

  under the heading "Beneficiary Information". The average amount of these 5,134

  transfers was $806.

118.     **Based on this, and other similar data regarding EXPRESS CELLULAR, there is**

**probable cause to believe that between 2013 and the present, EXPRESS CELLULAR has**

**utilized various wire transfer services, to initiate wire transfers to Mexico, in amounts**

**between $600-$999, totaling approximately $10,000,000.**

## Statistical Analysis by Arizona Attorney General

119.     In addition to the above described statistical analysis, the following analysis was

performed by analysts from the Arizona Attorney General (AAG; see Case Background). This

analysis utilized subpoenaed money transfer data of at least $500 per transaction for each

location and corresponding money transmitter relationships for the period from approximately

January 2016 through the most recent subpoenaed transaction record available date.

120.     Transfer transaction data for each location (NOTE: Each of the two business locations for **LOS ROSALES 2** were examined separately) was analyzed to determine if indicators were present of a heavy concentration of sent transfers paid in high risk Mexico drug source corridor states (Nayarit, Jalisco, Sinaloa, etc.) and secondarily if sent transfers contained indicators of bulk cash structuring.

121.     The chart immediately below compares the total volume of sent transfers paid in Mexico from each suspect location to the volume sent from each location paid in the state of Nayarit and at the second highest paying state, Jalisco. The chart indicates that approximately 50% of all transfers sent from the four suspect locations were paid in Nayarit.

| Recording Agent Address | Total Amount Sent | Paid in Nayarit | Paid in Jalisco | Nayarit Percent of Total |
|---|---|---|---|---|
| **1028 SHADY LANE RD** | $14,542,702 | $6,953,229 | $2,665,867 | 48% |
| **3307 EAST MAIN ST** | $436,022 | $161,211 | $72,666 | 37% |
| **4260 EASTLAND SQ DR** | $2,351,913 | $1,571,355 | $184,765 | 67% |
| **4340 E MAIN STREET STE A** | $1,470,907 | $670,623 | $294,140 | 46% |

122.     Excluding the four suspect locations above, analysis of the forty highest volume sending agents to Mexico in Columbus, OH sent an average of only 5% of total sends to the state of Nayarit. Analysts believe if there were legitimate reasons why the target locations sent such a high volume and percentage of transfers to the state of Nayarit as opposed to other Mexican States those same legitimate reasons would apply to all nearby sending agent locations in Columbus and those sending agents would also display heavy concentrations of total volume sent to Nayarit, which is not the case.

123.     Analysts examined daily money transfer activity from the four suspect locations from January 1, 2016 forward. (NOTE: This analysis did not include data from Transfast.) Analysts located repeated almost daily examples of apparent bulk cash structuring sent primarily to payees in the state of Nayarit and similar examples though in much lower volumes and frequency to the

states of Jalisco and Sinaloa (both significant Mexico drug source states). Analysts and fellow investigators are aware that bulk cash structuring through MSB sending agents collaborating with money laundering organizations (MLOs) always displays in varying volumes all of the following red flags or criteria:

A. Heavy concentration of sent transfers paid in one primary drug source state in Mexico;

B. High frequency over a short period (often in minutes) of daily sent transfers to the same drug source state;

C. Almost all sent transfers are below corporate MSB government ID thresholds at which the corporate MSB requires provision of a government ID number;

D. Money Transfer principal amounts are repeated in daily activity and/or are concentrated in a dollar range;

E. High percentages, over **80%,** of money transfers to drug source states have non-repetitive sender and payee name combinations.

124. The four suspect locations sent over $19 million to Mexico in three and a half years while over $9 million of the total was sent to Nayarit (payee state concentration). Over 24,550 transfers were sent from the four suspect locations to all of Mexico and only approximately 1% of those transfers (approximately 400 transfers) displays a government ID number (99% below ID thresholds).

125. The following are representative samples of hundreds of daily examples across all four suspect locations which display all of the criteria listed above for complicit sending agents. The chart displays activity sent from 1028 Shady Lane Road on January 26, 2019 that was paid in the state of Nayarit. There were 14 transfers sent using three corporate MSBs (Omnex, Girosol and CES) involving 14 different sender names and 14 different payee names in a dollar range of $720

to $900. There were groupings of sent transfers with the same dollar amount - for example: two transfers at $790, two at $810 and 2 at $900. The chart displays numerous transfers sent on the same minute or within minutes of other transfers, a near impossibility unless sending cashiers at the suspect locations have pre-fabricated the money transfer send forms with false sender and payee information. Another high improbability is the arrival of 14 different senders at 1028 Shady Lane Road on January 26, 2019, all standing in line together to send transfers to payees primarily in Tepic, Nayarit (11 of the 14 transfers), and all sent between $720 and $900 each. If this activity occurred once or a few times over three and a half years it would not be suspicious however this activity occurred almost daily at all four suspect locations. The groupings of dollar amounts into a tight range with often repeated amounts is indicative of bulk cash delivered to the complicit sending agent along with a list of payee names in Nayarit. The sending agent personnel break up the drug cash into different money transfers at amounts just below the Corporate MSB's ID threshold and then fabricate sender identities to correspond with provided payee names. The complicit sending agent personnel receive a tip or bribe from the MLO for each sent transfer.

| MT | Send Date Time | Amount | SenderName | PayeeName | Payee City | Payee State |
|---|---|---|---|---|---|---|
| Omnex | 1/26/2019 11:41 | $900 | MIGUEL TOREADA GONZALEZ | FRANCISCO JAVIER ASPERICUETA GONZALEZ | TEPIC | NAYARIT |
| Girosol | 1/26/2019 11:58 | $790 | Bianca Flores Morelos | Eduardo Flores Revuelta | Tepic | NAYARIT |
| Girosol | 1/26/2019 11:58 | $720 | Bartolo Macias Garcia | Luis Adrian Aldrete Macias | San Blas | NAYARIT |
| Omnex | 1/26/2019 12:28 | $810 | ROSALIDA LOPEZ TORRES | ROMALDO CRUZ TORRES | TEPIC | NAYARIT |
| Omnex | 1/26/2019 12:38 | $880 | EDUARDO TORRES RODRIGUEZ | NATALIA TORRES GURROLA | TEPIC | NAYARIT |
| Girosol | 1/26/2019 13:14 | $760 | Karina Banuelos Martinez | Arcelia Banuelos Bustamantes | Tepic | NAYARIT |
| Girosol | 1/26/2019 13:14 | $800 | Sebastian Casillas Lopez | Blanca Azucena Casillas Gutierrez | Tuxpan | NAYARIT |
| Omnex | 1/26/2019 13:40 | $900 | MARIA OFELIA TEJEDA PERALES | NOE TEJEDA LOPEZ | TEPIC | NAYARIT |
| CES | 1/26/2019 13:40 | $850 | kassandra perez castaneda | norma patricia castaneda banuelos | tepic | NAYARIT |
| Girosol | 1/26/2019 14:35 | $840 | Reynaldo Martinez Rosales | Rosidelia Martinez Ramirez | Tepic | NAYARIT |
| Omnex | 1/26/2019 16:03 | $790 | DAMIAN ANTONIO MORA GONZALEZ | ANA KAREN MORA GONZALEZ | TEPIC | NAYARIT |
| Omnex | 1/26/2019 16:31 | $870 | DAYANIRA LUNA VELEZ | MARIA HILDA VELEZ ARCADIA | TEPIC | NAYARIT |
| Girosol | 1/26/2019 16:39 | $770 | Jaziel Guerrero Becerra | Liliana Guerrero Perez | Acaponeta | NAYARIT |
| Girosol | 1/26/2019 16:39 | $810 | Renato Cordero Moncada | Wendy Karina Cordero Guerrero | Tepic | NAYARIT |
| | Total | $11,490 | | | | |

126.    The following chart is an example of 10 transfers sent in one hour and 40 minutes on

September 22, 2017, from suspect location 4340 E Main Street. All were paid in Tepic, Nayarit,

with 10 different sender and 10 different payee names, yet all of the senders sent either $890 or

$840 each.

| MT | Send Date Time | Amount | Sender Name | Payee Name | Payee City | Payee State |
|---|---|---|---|---|---|---|
| SIGUE | 9/22/17 11:06 | $890 | HERMINA CARRILLO JUAREZ | KEVIN ALEJANDRO CARRILLO CHAIRES | TEPIC | NAYARIT |
| SIGUE | 9/22/17 11:43 | $890 | MIRNA ISABEL HUERTA JIMENEZ | FRANCISCO JAVIER AVELAR OLVERA | TEPIC | NAYARIT |
| SIGUE | 9/22/17 11:52 | $840 | JAVIER RODRIGUEZ AREAS | BLANCA ESTELA RODRIGUEZ AREAS | TEPIC | NAYARIT |
| SIGUE | 9/22/17 12:12 | $840 | SUSANA MARIA BLANCO SERRANO | CHRISTIAN HILARIO CORDERO RAMOS | TEPIC | NAYARIT |
| SIGUE | 9/22/17 12:22 | $890 | DIEGO JAVIER OCAMPO HUERTA | LUIS ALBERTO FLORES GARCIA | TEPIC | NAYARIT |
| SIGUE | 9/22/17 12:26 | $840 | JOSE ISACK MONTES SUAREZ | HILARIA ARIAS ZAMORA | TEPIC | NAYARIT |
| SIGUE | 9/22/17 12:32 | $890 | TOMASA PEREZ MALDONADO | RENE PEREZ MALDONADO | TEPIC | NAYARIT |
| SIGUE | 9/22/17 12:32 | $890 | FERNANDO ESTRADA GUTIERREZ | DEOVALDO GUTIERREZ ALFARO | TEPIC | NAYARIT |
| SIGUE | 9/22/17 12:42 | $840 | JAIME GAYTAN IBARRA | CINTHIA FERNANDEZ IBARRA | TEPIC | NAYARIT |
| SIGUE | 9/22/17 12:46 | $840 | ALEJANDRA PEREZ SANCHEZ | ESTEFANIA VARGAS BUENO | TEPIC | NAYARIT |

127.    Another even more significant example of bulk cash structuring involves transfers sent in

minutes from one sending agent location and all of the sent transfers are paid on the same day

within minutes at the same paying agent location in a different country. The following chart

displays 16 transfers sent from suspect location, 4260 Eastland SQ DR, on March 3, 2018, in

minutes, and all but one of the transfers were paid on March 5, 2018 at Banco Azteca located at

AV Mexico #613 in Tepic, Nayarit. The sending corporate MSB was Omnex which supplied the

actual minute in which eight (8) of the transfers were paid on March 5, 2018. The payout times

ranged between 1621 and 1903 hours. However, seven of the transfers were paid within 32

minutes to seven different payee names, or one payout every four and a half minutes. Analysts

have reason to believe this activity reveals one drug trafficking or money laundering

organization based in Nayarit, Mexico not only is controlling the money transfer activity at agent

locations in Columbus, OH, by supplying bulk drug cash and payee name lists but is also

controlling the money transfer payout activity of agent locations in Nayarit, Mexico. Just as

transfers are fabricated at the suspect agent locations in Columbus using fake names and

addresses so are the supplied intended payee names in Nayarit. The seven transfers to seven different payee names were likely paid to one trafficker.

| Send Data Time | Pay Date Time | Amount | Sender Name | Payee Name | Paying Agent Address | Paying Agent State |
|---|---|---|---|---|---|---|
| 03/03/2018 10:20 | 03/04/2018 19:17 | $800 | NOLBERTO RAMOS AYON | MAXIMINO RAMOS RUIZ | AV MEXICO #613 | NAYARIT |
| 03/03/2018 10:41 | 03/05/2018 18:51 | $750 | FERNANDO SANCHEZ LANGARICA | JORGE HUMBERTO SANCHEZ LANGARICA | AV MEXICO #613 | NAYARIT |
| 03/03/2018 10:49 | 03/05/2018 16:21 | $770 | CLEMENTE JIMENEZ CASTILLO | MARIBEL MARTINEZ BARRO | AV MEXICO #613 | NAYARIT |
| 03/03/2018 10:58 | 03/05/2018 18:40 | $700 | GUSTAVO OLIVARES MENDOZA | DONALDO DE JESUS MENDOZA CASTILLO | AV MEXICO #613 | NAYARIT |
| 03/03/2018 11:02 | 03/05/2018 18:31 | $900 | BRAULIO GONZALEZ ALVAREZ | MARTHA ELENA ALVAREZ TAPIA | AV MEXICO #613 | NAYARIT |
| 03/03/2018 11:38 | 03/05/2018 18:43 | $780 | YOLANDA SANCHEZ ORTIZ | ALEJANDRA DANIELA SANCHEZ ORTIZ | AV MEXICO #613 | NAYARIT |
| 03/03/2018 11:40 | 03/05/2018 18:34 | $800 | AGUSTIN LOPEZ GONZALEZ | JUAN CARLOS GONZALEZ LOPEZ | AV MEXICO #613 | NAYARIT |
| 03/03/2018 11:43 | 03/05/2018 19:03 | $770 | BENJAMIN TORRES MENDOZA | CELIA TORRES MONTANO | AV MEXICO #613 | NAYARIT |
| 03/03/2018 12:18 | 03/05/2018 18:37 | $690 | ALVARO DOMINGUEZ FLORES | MARISOL DOMINGUEZ GRAJEOLA | AV MEXICO #613 | NAYARIT |
| 03/03/2018 14:13 | 03/05/2018 0:00 | $850 | CARMELO LOPEZ JIMENEZ | PEDRO SANTOS GARCIA | AV MEXICO #613 | NAYARIT |
| 03/03/2018 14:19 | 03/05/2018 0:00 | $800 | SANDRA ROSALES OCAMPO | PIEDAD GONZALEZ OCAMPO | AV MEXICO #613 | NAYARIT |
| 03/03/2018 14:26 | 03/05/2018 0:00 | $740 | DANTE RODRIGUEZ LOPEZ | JORGE ALBERTO RODRIGUEZ LOPEZ | AV MEXICO #613 | NAYARIT |
| 03/03/2018 14:29 | 03/05/2018 0:00 | $700 | PAULA VILLA LOPEZ | JOSE MARTIN MUNOZ VILLA | AV MEXICO #613 | NAYARIT |
| 03/03/2018 14:42 | 03/05/2018 0:00 | $760 | FUSTINO JIMENEZ LOPEZ | KARLA CECILIA LOPEZ JIMENEZ | AV MEXICO #613 | NAYARIT |
| 03/03/2018 15:16 | 03/05/2018 0:00 | $765 | RAMON BLANCO CARVAJAL | MANUEL DE JESUS BANUELOS VILLAREAL | AV MEXICO #613 | NAYARIT |
| 03/03/2018 15:28 | 03/05/2018 0:00 | $625 | OMAR ALVAREZ MONDRAGON | MARIA ELVIRA COVARRUBIAS ALVAREZ | AV MEXICO #613 | NAYARIT |

## Ownership

128.      Since approximately 2014 applications or agreements have been filed with the following wire transfer services to allow **LOS ROSALES** to serve as agent: Transfast, Sigue, Girosol, Intermex, and Omnex. All of these documents indicate that the owner of **LOS ROSALES** is **JOSE ROSALES**.

    A. 5th 3rd Bank has provided surveillance video of **JOSE ROSALES** depositing cash for the purposes of paying Sigue on behalf of **LOS ROSALES**.

    B. 5th 3rd Bank has provided surveillance video of **JOSE ROSALES** depositing cash for the purposes of paying Omnex on behalf of **LOS ROSALES**.

129. Since approximately 2016 applications or agreements have been filed with the following wire transfer services to allow **LOS ROSALES 2** to serve as agent: Transfast, Sigue, Girosol, Intermex, and Boss Revolution. All of these documents indicate that the owner of **LOS ROSALES 2 is THANIA ROSALES**.

    A. 5th 3rd Bank has provided surveillance video of **THANIA ROSALES** depositing cash for the purposes of paying Boss Revolution on behalf of **LOS ROSALES 2**.

    B. Key Bank has provided surveillance video of **THANIA ROSALES** depositing cash for the purposes of paying Sigue on behalf of **LOS ROSALES 2**.

130. Since approximately November of 2015, applications or agreements have been filed with the following wire transfer services to allow **EXPRESS CELLULAR** to serve as agent: Transfast, Sigue, Girosol, Omnex, and Boss Revolution. All of these documents indicate that the owner of **EXPRESS CELLULAR** is **JOSUE GAMA**. Prior applications filed with Transfast and RIA indicate **DULCE ROSALES** as the owner of **EXPRESS**.

    A. 5th 3rd Bank has provided surveillance video of **JOSUE GAMA** depositing cash for the purposes of paying Omnex on behalf of **EXPRESS CELLULAR**.

## Locations to be Searched

### 1028 Shady Lane Rd., Columbus, OH 43227; Business location of LOS ROSALES

131.     As established previously in this Affidavit, **LOS ROSALES** is a member of the **JOSE ROSALES MONEY LAUNDERING ORGANIZATION (JOSE ROSALES MLO)**. The following allegations pertain to time periods during the course of the ongoing fraud scheme.

132.     Your Affiant is aware that 1028 Shady Lane Rd., Columbus, OH 43227, is the business location of **LOS ROSALES**.

133.     Your Affiant is unaware of **LOS ROSALES** operating at any location other than 1028 Shady Lane Rd., Columbus, OH 43227.

134.     Your Affiant has compared wire transfer records to video surveillance of 1028 Shady Lane Rd., Columbus, OH 43227. On more than one occasion the number of customers entering 1028 Shady Lane Rd., Columbus, OH 43227, is less than the number of wire transfers sent to Mexico during the same time frame.

135.     Altered receipts from wire transfers conducted at **LOS ROSALES** have been discovered in the cellular phones of narcotics traffickers.

136.     Several lists were recovered from the phones of narcotics traffickers that match up exactly with beneficiaries of wire transfers from **LOS ROSALES**.

137.     Numerous addresses listed for senders of wire transfers from **LOS ROSALES** were determined to be fictitious.

138.     In July of 2018, trash was collected from 1028 Shady Lane Rd., Columbus, OH 43227. Retrieved from the trash were numerous hand-written notes. At least five of these notes contained larger numbers above $2,000, surrounded by several amounts below $1,000. When the smaller numbers were added together, they equaled the larger number. For example, one note

contained the number $2,160, beneath this number in smaller font, were the following numbers: $660, $810, and $690.

139.     To the best of your Affiant's knowledge, **LOS ROSALES** is currently serving as an agent for multiple wire transfer services at 1028 Shady Lane Rd., Columbus, OH 43227.

**4340 East Main St., Suite A, Columbus, OH 43213; Business location of LOS ROSALES 2**

140.     As established previously in this Affidavit, **LOS ROSALES 2** is a member of **JOSE ROSALES MLO**. The following allegations pertain to time periods during the course of the ongoing fraud scheme.

141.     Your Affiant is aware that 4340 East Main St., Suite A, Columbus, OH 43213, is the business location of **LOS ROSALES 2**.

142.     **LOS ROSALES 2** previously operated at a location different than 4340 East Main St., Suite A, Columbus, OH 43213. However, during the course of this investigation your Affiant is unaware of **LOS ROSALES 2** operating at any location other than 4340 East Main St., Suite A, Columbus, OH 43213.

143.     Your Affiant has compared wire transfer records to video surveillance of 4340 East Main St., Suite A, Columbus, OH 43213. On more than one occasion the number of customers entering 4340 East Main St., Suite A, Columbus, OH 43213 is less than the number of wire transfers sent to Mexico during the same time frame.

144.     Altered receipts from wire transfers conducted at **LOS ROSALES 2** have been discovered in the cellular phones of narcotics traffickers.

145.     Several lists were recovered from the phones of narcotics traffickers that match up exactly with beneficiaries of wire transfers from **LOS ROSALES 2**.

146.     Multiple addresses listed for senders of wire transfers from **LOS ROSALES 2** were determined to be fictitious.

147.     To the best of your Affiant's knowledge, **LOS ROSALES 2** is currently serving as an agent for at least one wire transfer services at 4340 East Main St., Suite A, Columbus, OH 43213.

**4260 Eastland Square Dr., Columbus, OH 43232; Business location of EXPRESS CELLULAR**

148.     As established previously in this Affidavit, **EXPRESS CELLULAR** is a member of the **JOSE ROSALES MLO**. The following allegations pertain to time periods during the course of the ongoing fraud scheme.

149.     Your Affiant is aware that 4260 Eastland Square Dr., Columbus, OH 43232, is the business location of **EXPRESS CELLULAR**.

150.     Your Affiant is unaware of **EXPRESS CELLULAR** operating at any location other than 4260 Eastland Square Dr., Columbus, OH 43232.

151.     Your Affiant has compared wire transfer records to video surveillance of 4260 Eastland Square Dr., Columbus, OH 43232. On more than one occasion the number of customers entering 4260 Eastland Square Dr., Columbus, OH 43232, is less than the number of wire transfers sent to Mexico during the same time frame.

152.     Altered receipts from wire transfers conducted at **EXPRESS CELLULAR** have been discovered in the cellular phones of narcotics traffickers.

153.     Several lists were recovered from the phones of narcotics traffickers that match up exactly with beneficiaries of wire transfers from **EXPRESS CELLULAR**.

154.     Numerous addresses listed for senders of wire transfers from **EXPRESS CELLULAR** were determined to be fictitious.

155.    To the best of your Affiant's knowledge, **EXPRESS CELLULAR** is currently serving as an agent for multiple wire transfer services at 4260 Eastland Square Dr., Columbus, OH 43232.

**1805 Elaine Rd., Columbus, OH 43227, including the curtilage; Residence of JOSE ROSALES**

156.    The **LOS ROSALES** Agent Application for Omnex is dated October 18, 2017, and lists **JOSE LUIS ROSALES** as the 100% Owner/Guarantor of **LOS ROSALES**. The street address listed for **JOSE LUIS ROSALES** is 1805 Elaine Rd., Columbus, OH.

157.    The **LOS ROSALES** Agent Setup and Configuration for RIA Financial was completed in approximately September of 2018, and lists **JOSE LUIS ROSALES OCAMPO** as the 100% Member. The contact information for **JOSE LUIS ROSALES OCAMPO** lists a home address of 1805 Elaine Rd., Columbus, OH 43227.

158.    On July 30, 2019, at approximately 2:49 PM, law enforcement observed an Unidentified Female Hispanic with a black bag strapped across her enter **LOS ROSALES** at 1028 Shady Lane Rd., Columbus, OH 43227.

   A.    At approximately 2:50 PM the same Unidentified Female Hispanic exited **LOS ROSALES** without the black bag. This Unidentified Female Hispanic then drove to 1805 Elaine Rd., Columbus, OH 43227, and at approximately 2:58 PM used a key to open the door to the residence.

159.    On August 13, 2019, at approximately 8:00 AM, law enforcement observed **JOSE LUIS ROSALES OCAMPO (JOSE ROSALES)** exit a residence located at approximately 1805 Elaine Rd., Columbus, OH 43227 (NOTE: 1805 Elaine Rd. is adjacent to 1809 Elaine Rd. and the two residences share a common front porch; it was from one of these two residences that **JOSE ROSALES** exited). **JOSE ROSALES** entered a vehicle that had been parked across from, and facing, the residence at 1805 Elaine Rd., Columbus, OH 43227. The vehicle entered

by **JOSE ROSALES** was a GMC Terrain with Ohio license plate HNE-1210. According to a law enforcement database the owner of the above vehicle is **JOSE LUIS ROSALES OCAMPO**. The street address associated with this vehicle is 1028 Shady Lane Rd., Columbus, OH 43227, and the address type is listed as "Residence." **JOSE ROSALES** exited the parking lot traveling north.

    A. At approximately 8:08 AM, a GMC Terrain with Ohio license plate HNE-1210 was parked in front of 1028 Shady Lane Rd., Columbus, OH 43227. The vehicle appeared to be unoccupied.

160.     On August 15, 2019, law enforcement conducted physical and video surveillance of **JOSE ROSALES**. At approximately 7:44 AM, law enforcement observed **JOSE LUIS ROSALES OCAMPO (JOSE ROSALES)** exit a residence located at 1805 Elaine Rd., Columbus, OH 43227. **JOSE ROSALES** was carrying a bag and cup. The bag was light green or gray in color and appeared to be made of a cloth material. **JOSE ROSALES** entered a vehicle that had been parked near the residence at 1805 Elaine Rd., Columbus, OH 43227. The vehicle entered by **JOSE ROSALES** was a GMC Terrain with Ohio license plate HNE-1210. **JOSE ROSALES** exited the parking lot traveling north.

    A. At approximately 7:52 AM, **JOSE ROSALES** arrived at **LOS ROSALES**, 1028 Shady Lane Rd., Columbus, OH 43227. **JOSE ROSALES** accessed the passenger door then approached the entrance to **LOS ROSALES**. **JOSE ROSALES** keyed the front door of **LOS ROSALES** and then entered the business. While **JOSE ROSALES** was keying the front door of the business, law enforcement physically observed what appeared to be the light green or gray bag taken from 1805 Elaine Rd., Columbus, OH 43227, on the sidewalk in front of **LOS ROSALES** and at the feet of **JOSE ROSALES**.

B. At approximately 7:53 AM, law enforcement drove past **LOS ROSALES** and the bag was no longer on the sidewalk.

### 3470 Oak Bend Blvd., Canal Winchester, OH 43110, including the curtilage and any vehicles on the curtilage; Residence of THANIA ROSALES

161.　　**THANIA ROSALES** and Luis Alcauter-Alcauter purchased the residence at 3470 Oak Bend Blvd., Canal Winchester, OH 43110, for the Sales Price of $100,000, in May of 2017. The purchase price for 3470 Oak Bend Blvd., Canal Winchester, OH 43110, was paid in full through four wire transfers. Two of the wire transfer came from bank accounts under the control of **THANIA ROSALES**. The two wire transfers from the bank accounts under the control of **THANIA ROSALES** were conducted on May 17, 2017, for the following amounts:

A. $18,000; JP Morgan Chase Bank Account 123716960

B. $14,600; 5th 3rd Bank Account 7974766151

162.　　On October 15, 2018, law enforcement removed three trash bags from the refuse can in front of 3470 Oak Bend Blvd., Canal Winchester, OH 43110, that had been placed at the curbside for removal. Investigators searched the trash bag and located a Sigue deposit slip for Key Bank for the total amount of $3,055.

163.　　On June 11, 2019, video surveillance reveals vehicles similar to those associated with **THANIA ROSALES** and **JOSE ROSALES**, both leaving **LOS ROSALES** at approximately 4:05 PM. At approximately 4:40 PM, law enforcement observed **JOSE ROSALES** park a red GMC Terrain, Ohio license plate HNE-1210, across the street from 3470 Oak Bend Blvd., Canal Winchester, OH 43110. Law enforcement further observed **THANIA ROSALES** walk to this vehicle after it was parked by **JOSE ROSALES** across the street from 3470 Oak Bend Blvd., Canal Winchester, OH 43110.

164.      On July 23, 2019, law enforcement conducted surveillance on **THANIA ROSALES** and observed her leaving 4340 East Main St., Suite A, Columbus, OH 43213, driving a black Toyota RAV4, Ohio license plate HNN-1641, at approximately 10:31 AM. **THANIA ROSALES** then drove to 3470 Oak Bend Blvd., Canal Winchester, OH 43110. Prior to entering 3470 Oak Bend Blvd., Canal Winchester, OH 43110, **THANIA ROSALES** accessed the passenger side of her vehicle.

    A. At approximately 12:46 PM on July 23, 2019, law enforcement observed **THANIA ROSALES** leave 3470 Oak Bend Blvd., Canal Winchester, OH 43110. In approximately 91 minutes after leaving 3470 Oak Bend Blvd., Canal Winchester, OH 43110, **THANIA ROSALES** traveled to the following locations in this order: La Michoacana, 166 S Hamilton Rd, Whitehall, OH 43213; **LOS ROSALES**, 1028 Shady Lane Rd., Columbus, OH 43227; **EXPRESS CELLULAR**, 4260 Eastland Square Dr., Columbus, OH 43232; and **LOS ROSALES 2**, 4340 East Main St., Suite A, Columbus, OH 43213. While **THANIA ROSALES** was at 4340 East Main St., Suite A, Columbus, OH 43213, an unidentified young Hispanic female removed a trash bag and two grocery style bags from this business and placed them in an unsecured dumpster located at the rear of this location. At approximately 2:46 PM **THANIA ROSALES** and the unidentified young Hispanic female left 4340 East Main St., Suite A, Columbus, OH 43213.

    B. On July 23, 2019, law enforcement removed the trash bag and one of the grocery style bags that had been placed in the unsecured dumpster located at the rear of the 4340 East Main St., Suite A, Columbus, OH 43213. The contents of these trash bags included the following: Bank bands for U.S. Currency marked in denominations of $50, $100, $250,

$500, $1,000 and $2,000; documents related to bank deposits; and numerous shredded wire transfer receipts.

165. On August 22, 2019, law enforcement removed two trash bags from the refuse can in front of 3470 Oak Bend Blvd., Canal Winchester, OH 43110, that had been placed at the curbside for removal. Investigators searched the trash bag and located a blank Sigue deposit slip for Key Bank.

## 720 Preston Trails Dr., Pickerington, OH 43147, including the curtilage and any vehicles on the curtilage; Residence of JOSUE GAMA and DULCE ROSALES

166. **JOSUE GAMA** and **DULCE ROSALES** purchased the residence at 720 Preston Trails Dr., Pickerington, OH 43147, for the Contract Sales Price of $189,000, on December 2, 2016. This purchase was completed with four cashier's checks and therefore no mortgage was taken on the property. The largest of the four checks used to purchase this property was drawn directly from the **EXPRESS CELLULAR** business account at Chase Bank (#556909302) in the amount of $74,000 (NOTE: It appears this check was purchased with a withdrawal of $65,000 and $9,000 in cash).

167. On July 9, 2018, law enforcement conducted surveillance on **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232. At approximately 5:46 PM, law enforcement observed **DULCE ROSALES** and several children enter a white Acura with Ohio license plate HHH-6056. Law enforcement followed this vehicle directly to a residence located at 3470 Oak Bend Blvd., Canal Winchester, OH 43110 (NOTE: This residence is known to be the home of **THANIA ROSALES**.) At approximately 5:54 PM, the occupants of the white Acura, including **DULCE ROSALES**, entered residence located at 3470 Oak Bend Blvd., Canal Winchester, OH 43110.

A. At approximately 7:18 PM, law enforcement observed **DULCE ROSALES** and several children exit 3470 Oak Bend Blvd., Canal Winchester, OH 43110, and enter the white Acura with Ohio license plate HHH-6056. The white Acura traveled to a McDonald's drive thru and then proceeded to 720 Preston Trails Dr., Pickerington, OH 43147.

168.     On July 10, 2018, law enforcement conducted surveillance on the residence located at 720 Preston Trails Dr., Pickerington, OH 43147. At approximately 9:08 AM, law enforcement observed **JOSUE GAMA** carrying boxes from the garage of 720 Preston Trails Dr., Pickerington, OH 43147, to a white van with Ohio license plate GBA-6818.

A. At approximately 10:45 AM, law enforcement observed **JOSUE GAMA** and a child carrying the boxes from the white van into **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232.

169.     On August 19, 2019, law enforcement conducted surveillance on the residence located at 720 Preston Trails Dr., Pickerington, OH 43147. At approximately 9:21 AM, law enforcement observed **JOSUE GAMA** carry a large cardboard box from the garage of 720 Preston Trails Dr., Pickerington, OH 43147, and place it in the rear of a white van with Ohio license plate GBA-6818. At approximately 9:28 AM, law enforcement observed **JOSUE GAMA** carry a flat screen television from the residence of 720 Preston Trails Dr., Pickerington, OH 43147, and place it in the rear of the white van.

A. At approximately 9:31 AM, **JOSUE GAMA** entered the white van and drove directly to **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232. **JOSUE GAMA** parked the white van directly in front of **EXPRESS CELLULAR**. **JOSUE GAMA** removed a flat screen television from the white van and entered **EXPRESS CELLULAR**. **JOSUE GAMA** then exited **EXPRESS CELLULAR**,

propped the door to the business open, returned to the rear of the van, and carried a large cardboard box into **EXPRESS CELLULAR**. **JOSUE GAMA** exited **EXPRESS CELLULAR** again, and carried what appeared to be music lighting equipment from the van into **EXPRESS CELLULAR**.

170.     On August 20, 2019, law enforcement was conducting surveillance on the residence located at 720 Preston Trails Dr., Pickerington, OH 43147. At approximately 8:52 AM, law enforcement observed **DULCE ROSALES** enter a white Acura with Ohio license plate HHH-6056 and depart from the residence.

   A. At approximately 9:35 AM, **DULCE ROSALES** arrived at **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232, driving the white Acura. At approximately 9:38 AM, **DULCE ROSALES** exited the vehicle and carried three large gift style bags into **EXPRESS CELLULAR**. Also at approximately 9:38 AM, **JOSUE GAMA** arrived driving a white van with Ohio license plate GBA-6818. **JOSUE GAMA** exited the vehicle carrying a small dog and entered **EXPRESS CELLULAR**.

171.     On August 22, 2019, law enforcement conducted surveillance on the residence located at 720 Preston Trails Dr., Pickerington, OH 43147. At approximately 8:49 AM, law enforcement observed **DULCE ROSALES** exit the residence carrying a purse and a bag. **DULCE ROSALES** entered a white Acura with Ohio license plate HHH-6056 and drove away from the residence.

   A. At approximately 9:24 AM, the white Acura was observed in the parking lot of **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232.

172.     On August 23, 2019, law enforcement conducted surveillance on the residence located at 720 Preston Trails Dr., Pickerington, OH 43147. At approximately 8:49 AM, law enforcement

observed **DULCE ROSALES** exit the residence carrying what appeared to be a container. **DULCE ROSALES** entered a white Acura with two children and drove away from the residence. Law enforcement followed **DULCE ROSALES** to an elementary school. At approximately 9:06 AM **DULCE ROSALES** departed from the elementary school and no one else was seen in the vehicle with her. After departing from the elementary school, law enforcement continued to follow the white Acura.

A. At approximately 9:17 AM, the white Acura with Ohio license plate HHH-6056 entered the Eastland Square parking lot and parked directly in front of **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232. **JOSUE GAMA** exited from the passenger seat, appeared to have something under his right arm, appeared to open the door to **EXPRESS CELLULAR** with a key and then entered the store (NOTE: **JOSUE GAMA** was not previously observed entering the vehicle or while the vehicle was at the elementary school). **DULCE ROSALES** also entered **EXPRESS CELLULAR** at this time. **JOSUE GAMA** returned to the Acura and then re-enters **EXPRESS CELLULAR** carrying a bag. **JOSUE GAMA** returned to the Acura again and then re-entered **EXPRESS CELLULAR** using both hands to carry an item.

173. On August 23, 2019, law enforcement observed a trash can at the end of the driveway of the residence located at 720 Preston Trails Dr., Pickerington, OH 43147. Law enforcement arranged to have the contents of this trash can provided to law enforcement once it had been collected by a Rumpke employee. Law enforcement observed a Rumpke employee collect the trash from 720 Preston Trails Dr., Pickerington, OH 43147, and this trash was provided to law enforcement at a second location. Items recovered from the trash collected at 720 Preston Trails Dr., Pickerington, OH 43147, included:

A. A Chase Bank deposit slip dated June 11, 2019, for a bank account ending in 9302 (NOTE: The **EXPRESS CELLULAR** business account at Chase Bank ends in 9302.)

B. A Huntington deposit slip dated June 11, 2019.

C. An invoice dated May 6, 2019, addressed to **DULCE ROSALES**, "4260 eastland square dr, columbus ohio 43232."

## Vehicles

### 2013 GMC Terrain, Ohio license plate HNE-1210, red in color, registered to JOSE LUIS ROSALES-OCAMPO

174. According to a law enforcement database the owner of the above vehicle is **JOSE LUIS ROSALES OCAMPO.** The street address associated with this vehicle is 1028 Shady Lane Rd., Columbus, OH 43227, and the address type is listed as "Residence."

175. On June 11, 2019, law enforcement observed **JOSE ROSALES** park a red GMC Terrain, Ohio license plate HNE-1210, across the street from 3470 Oak Bend Blvd., Canal Winchester, OH 43110. Law enforcement further observed **THANIA ROSALES** walk to this vehicle after it was parked by **JOSE ROSALES** across the street from 3470 Oak Bend Blvd., Canal Winchester, OH 43110.

176. As detailed previously, there is probable cause to believe that on at least two occasions in August of 2019, **JOSE ROSALES** utilized the GMC Terrain, Ohio license plate HNE-1210, to travel to 1028 Shady Lane Rd., Columbus, OH 43227; from 1805 Elaine Rd., Columbus, OH 43227.

**2017 Toyota RAV4, Ohio license plate HNN-1641, black in color, registered to Luis Alcauter (known to be driven by THANIA ROSALES)**

177. On November 20, 2018, at approximately 1:58 PM, **ELIEZAR MENDOZA-NAVA** arrived at **LOS ROSALES 2**, 4340 East Main St., Suite A, Columbus, OH 43213. At this time **THANIA ROSALES** was present in the business and a black Toyota RAV4 was in the parking lot.

178. On July 18, 2019, law enforcement observed **THANIA ROSALES** leaving **LOS ROSALES**, 1028 Shady Lane Rd., Columbus, OH 43227, driving a black sport utility vehicle, Ohio license plate HNN-1641.

179. On July 23, 2019, law enforcement observed **THANIA ROSALES** leave 3470 Oak Bend Blvd., Canal Winchester, OH 43110, driving a black Toyota RAV4, Ohio license plate HNN-1641. In approximately 91 minutes after leaving 3470 Oak Bend Blvd., Canal Winchester, OH 43110, **THANIA ROSALES** traveled to the following locations in this order: La Michoacana, 166 S Hamilton Rd, Whitehall, OH 43213; **LOS ROSALES**, 1028 Shady Lane Rd., Columbus, OH 43227; **EXPRESS CELLULAR**, 4260 Eastland Square Dr., Columbus, OH 43232; and **LOS ROSALES 2**, 4340 East Main St., Suite A, Columbus, OH 43213.

**2017 Acura MDX, Ohio license plate HHH-6056, white in color, registered to JOSUE GAMA-PEREZ**

180. On July 9, 2018, law enforcement conducted surveillance on **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232. At approximately 5:46 PM, law enforcement observed **DULCE ROSALES** and several children enter a white Acura with Ohio license plate HHH-6056. Law enforcement followed this vehicle directly to a residence located at 3470 Oak Bend Blvd., Canal Winchester, OH 43110.

181. On June 24, 2019, at approximately 12:27 PM, law enforcement observed a white Acura with Ohio license plate HHH-6056 parked in front of **LOS ROSALES**, 1028 Shady Lane Rd., Columbus, OH 43227.

182. On August 23, 2019, at approximately 9:17 AM, a white Acura with Ohio license plate HHH-6056 entered the Eastland Square parking lot and parked directly in front of **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232. **JOSUE GAMA** exited from the passenger seat, appeared to have something under his right arm, appeared to open the door to **EXPRESS CELLULAR** with a key and then entered the store (NOTE: **JOSUE GAMA** was not previously observed entering the vehicle or while the vehicle was at the elementary school). **DULCE ROSALES** also entered **EXPRESS CELLULAR** at this time. **JOSUE GAMA** returned to the Acura and then re-enters **EXPRESS CELLULAR** carrying a bag. **JOSUE GAMA** returned to the Acura again and then re-entered **EXPRESS CELLULAR** using both hands to carry an item.

**2000 Chevrolet Express Cargo, Ohio license plate GBA-6818, white in color, registered to Windows and Houses Cleaning Gama.**

183. On July 10, 2018, law enforcement conducted surveillance on the residence located at 720 Preston Trails Dr., Pickerington, OH 43147. At approximately 9:08 AM, law enforcement observed **JOSUE GAMA** carrying boxes from the garage of 720 Preston Trails Dr., Pickerington, OH 43147, to a white van with Ohio license plate GBA-6818.

    A. At approximately 10:45 AM, law enforcement observed **JOSUE GAMA** and a child carrying the boxes from the white van into **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232.

184.    On August 19, 2019, at approximately 9:31 AM, **JOSUE GAMA** drove a white van, Ohio license plate GBA-6818, to **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232. **JOSUE GAMA** parked the white van directly in front of **EXPRESS CELLULAR. JOSUE GAMA** removed a flat screen television from the white van and entered **EXPRESS CELLULAR. JOSUE GAMA** then exited **EXPRESS CELLULAR**, propped the door to the business open, returned to the rear of the van, and carried a large cardboard box into **EXPRESS CELLULAR. JOSUE GAMA** exited **EXPRESS CELLULAR** again, and carried what appeared to be music lighting equipment from the van into **EXPRESS CELLULAR**.

185.    On August 20, 2019, at approximately 9:38 AM, **JOSUE GAMA** arrived at **EXPRESS CELLULAR** located at 4260 Eastland Square Dr., Columbus, OH 43232, driving a white van with Ohio license plate GBA-6818.

# CONCLUSION

186.     Your Affiant has investigated and is continuing to investigate the following individuals

and businesses for various offenses related to narcotics trafficking and money laundering:

    A. **JOSE LUIS ROSALES-OCAMPO ("JOSE ROSALES") and JOSE LUIS**

        **ROSALES LLC, DBA LOS ROSALES ("LOS ROSALES");**

    B. **THANIA ROSALES-GUADARRAMA AKA "NATALIE" ("THANIA ROSALES")**

        **and LOS ROSALES 2 LLC ("LOS ROSALES 2");**

    C. **JOSUE GAMA-PEREZ ("JOSUE GAMA") and EXPRESS CELLULAR Y MAS**

        **LLC ("EXPRESS CELLULAR");**

    D. **DULCE ROSALES-GUADARRAMA ("DULCE ROSALES"), AKA DULCE**

        **ROSALES, AKA DELCY BONILLA-CHACON, AKA DELCY N. BONILLA,**

        **AKA DULCE BONILLA; AKA "POOCHIES"; AKA "PUCHONA";**

    E. **ELIEZAR MENDOZA-NAVA ("MENDOZA-NAVA");**

    F. **RODRIGO ESQUEDA-VAZQUEZ ("ESQUEDA-VAZQUEZ");**

    G. **JULIO ANGEL HOMER GONZALEZ ("GONZALEZ");**

    H. **RODOLFO FRANCO-VALDEZ ("FRANCO-VALDEZ").**

187.     Based on the facts set forth herein, my experience, and the experience of other law

enforcement officers with whom I have conferred, I submit that there is probable cause to believe

that between 2013 and 2019, the exact dates being unknown, the above named individuals

conspired with others to distribute narcotics in the Southern District of Ohio, in violation of Title

21 U.S.C. § 846; and to launder narcotics proceeds from the Southern District of Ohio, to

Mexico, through the businesses **LOS ROSALES, LOS ROSALES 2,** and **EXPRESS**

**CELLULAR,** all in violation of Title 18 U.S.C. § 1956(h).

188.     The purpose of this affidavit is to secure Search Warrants for the following locations, to include the curtilage and any vehicles on the curtilage--

    A. **LOS ROSALES:**

        i. 1028 Shady Lane Rd., Columbus, OH 43227, (business location of **LOS ROSALES**, owned and operated by **JOSE ROSALES**); and

        ii. 1805 Elaine Rd., Columbus, OH 43227, (residence of **JOSE ROSALES**).

    B. **LOS ROSALES 2:**

        i. 4340 East Main St., Suite A, Columbus, OH 43213, (business location of **LOS ROSALES 2**, owned and operated by **THANIA ROSALES**); and

        ii. 3470 Oak Bend Blvd., Canal Winchester, OH 43110, (residence of **THANIA ROSALES**).

    C. **EXPRESS CELLULAR:**

        i. 4260 Eastland Square Dr., Columbus, OH 43232, (business location of **EXPRESS CELLULAR**); and

        ii. 720 Preston Trails Dr., Pickerington, OH 43147, (residence of **JOSUE GAMA** and **DULCE ROSALES**).

    D. **Vehicles:**

        i. 2013 GMC Terrain, Ohio license plate HNE-1210, red in color, registered to **JOSE LUIS ROSALES-OCAMPO;**

        ii. 2017 Toyota RAV4, Ohio license plate HNN-1641, black in color, registered to Luis Alcauter (known to be driven by **THANIA ROSALES);**

        iii. 2017 Acura MDX, Ohio license plate HHH-6056, white in color, registered to **JOSUE GAMA-PEREZ;** and

        iv. 2000 Chevrolet Express Cargo, Ohio license plate GBA-6818, white in color, registered to Windows and Houses Cleaning Gama.

189.     This affidavit provides probable cause to believe that searches of these locations will uncover fruits, evidence, or instrumentalities of a crime, namely criminal violations of Title 18

U.S.C. § 1956, and 21 U.S.C. § 846. All of these locations are described more specifically in

**Attachment A.** The items to be seized are documented in **Attachment B**.

Respectfully submitted,

Kevin Doyle
Special Agent
Internal Revenue Service
Criminal Investigation

Subscribed and sworn to before me on _____ 16 _____, 2019.

The Honorable Kimberly A. Jolson
United States Magistrate Judge

# Attachment A

# PROPERTY TO BE SEARCHED:

1. This affidavit is submitted in support of an application for search warrant(s) for evidence of violations of the federal laws named above at the following location(s):

   a. **1028 Shady Lane Rd., Columbus, OH 43227, including the curtilage,** has been identified as the business location of JOSE LUIS ROSALES LLC DBA LOS ROSALES (LOS ROSALES). LOS ROSALES has conducted business from this location since approximately 2014. This business is located in a strip mall, southeast of the intersection of E. Main St. and Shady Lane Rd. The parking lot to the north of this strip mall is a Shell gas station. The windows and doors of this business are almost completely covered with advertisements.





b. **4340 East Main St., Suite A, Whitehall, OH 43213, including the curtilage,** has been identified as the business location of LOS ROSALES 2 LLC ("LOS ROSALES 2"). LOS ROSALES 2 has conducted business from this location since approximately 2017. This business is located inside of a building that is also used as a "Wellness Center", northwest of the intersection of East Main St. and Westphal Ave. The building is marked with a white and green sign that displays the numbers "4340". The entrance to LOS ROSALES 2 is the western most door of the building and faces south.






c. **4260 Eastland Square Dr., Columbus, OH 43232, including the curtilage,** has been identified as the business location of EXPRESS CELLULAR Y MAS LLC (EXPRESS CELLULAR). EXPRESS CELLUAR has conducted business from this location since approximately 2013. This business is located in a strip mall southwest of the intersection of Refugee Rd. and Hamilton Rd. 4260 is located to the north inside of the strip mall and is marked with a sign, red and yellow in color, which reads "EXPRESS CELLULAR Y MAS". The windows and doors of this business are almost completely covered with advertisements.






d. **1805 Elaine Rd., Columbus, OH 43227, including the curtilage,** has been identified as the residence of JOSE LUIS ROSALES OCAMPO (JOSE ROSALES). This residence is an apartment located in the Sutton Square Townhomes apartment complex, near the intersection of Elaine Rd. and Elaine Place North. 1805 Elaine Rd. is adjacent to 1809 Elaine Rd. and the two residences share a common front porch.





Attachment A-JOSE LUIS ROSALES-OCAMPO, et al.

Page 4

e. **3470 Oak Bend Blvd., Canal Winchester, OH 43110, including the curtilage and any vehicles on the curtilage,** has been identified as the residence of THANIA ROSALES-GUADARRAMA. This residence is located north of the intersection of Refugee Rd. and Oak Bend Blvd. 3470 is approximately the third house north of Refugee Rd., on the east side of Oak Bend Blvd.



f. **720 Preston Trails Dr., Pickerington, OH 43147, including the curtilage and any vehicles on the curtilage,** has been identified as the residence of JOSUE GAMA-PEREZ ("JOSUE GAMA") and DULCE ROSALES-GUADARRAMA ("DULCE ROSALES"). This residence is located near the intersection of Preston Trails Dr. and Lillian Dr. The mailbox associated with this residence is unique and is designed to look like a lighthouse.





Attachment A-JOSE LUIS ROSALES-OCAMPO, et al.

g. **2013 GMC Terrain, Ohio license plate HNE-1210, red in color, registered to JOSE LUIS ROSALES-OCAMPO.** The below photos are not of the vehicle to be searched but are of vehicles similar to the vehicle to be searched.





h. **2017 Toyota RAV4, Ohio license plate HNN-1641, black in color, registered to Luis Alcauter (known to be driven by THANIA ROSALES).** The below photos are not of the vehicle to be searched but are of vehicles similar to the vehicle to be searched.





i. **2017 Acura MDX, Ohio license plate HHH-6056, white in color, registered to JOSUE GAMA-PEREZ.** The below photos are not of the vehicle to be searched but are of vehicles similar to the vehicle to be searched.





j. **2000 Chevrolet Express Cargo, Ohio license plate GBA-6818, white in color, registered to Windows and Houses Cleaning Gama.** The below photos are not of the vehicle to be searched but are of vehicles similar to the vehicle to be searched.





# Attachment B

# ITEMS TO BE SEIZED:

Records and information to be seized by the government:

1. All records and information that constitutes fruits, evidence, and instrumentalities of violations of 21 U.S.C. § 841 and § 846 (narcotics); any section of 18 U.S.C. § 1956 (money laundering) and/or 18 U.S.C. § 1957 (money laundering), regardless of the format in which they are or may be stored, for the period January 1, 2013, to the present, including:

   a. Records identifying the establishment, ownership, operation and/or control of any limited liability corporation or other business entity including articles of organization; correspondence with and/or submissions to/from any Secretary of State office; applications, disposition records and/or correspondence related to the issuance or use of Employer Identification Numbers (EIN); minutes and other official business records; and documents identifying any registered agent(s), incorporator(s), and/or other identified members;

   b. All records identifying, or related to, any wire or money transfers including: records that evidence the establishment, operation, activities, or disposition of, all business relationships with wire transfer services, including, but not limited to, records regarding training and certifications; all records regarding anti-money laundering information, training, compliance, or communications; all records related to requests for an electronic transfer or cash deposit, wiring or deposit instructions, receipts, and correspondence, including, but not limited to, historical wire-transfer records;

   c. All records related or referring to persons or entities in other countries and the locations of such persons entities;

   d. Asset ownership and/or acquisition records including contracts, invoices, receipts, registrations, titles insurance records and/or photographs of assets including motor vehicles, real property, boats, jewelry, precious metals and gems, and currency (foreign, domestic, or virtual currency);

   e. Travel records including travel directions, hotel reservations, rental car reservations, airplane reservations, invoices, airline tickets, and itineraries;

   f. Records related to banking or financial activity including communications and data related to the opening, closing, use, custody and/or control of bank accounts, alternative currency accounts (i.e. those related to Bitcoins), credit cards, and/or debit cards including applications for accounts; approval or declination notices; credit and/or debit card issuance notices; credit and/or debit card activations; bank statements; welcome or account opening/closing notifications; deposit, payment, withdrawal, or transfer orders, receipts and/or notifications; balance inquiries and/or

1

notices; and security notifications;

g. All financial statements, accounting records and supporting source documents relating to receipts, expenditures, general ledgers, accounts and notes receivable, accounts and notes payable, balance sheets, income statements, statements of profit and loss, and any other accounting records and other records and/or ledgers relating to **JOSE LUIS ROSALES LLC, DBA LOS ROSALES; LOS ROSALES 2 LLC, EXPRESS CELLULAR Y MAS LLC, and WINDOWS AND HOUSES CLEANING HOUSES CLEANING GAMA LLC,** or any variation of these entity names or any other entities identified through items seized pursuant to section b. above;

h. All records related to taxes to include; records of both personnel and business taxes paid, incurred, due, or computed; on sales, purchases, and income; related to any person or government, including federal, state, and local municipalities;

i. Electronic records of internet sites visited and data accessed and/or communications made in the course of visiting such internet sites;

j. Communications records and histories made through and/or from applications (known as "Apps"); emails; texts; calls or other media contained on the electronic devices to be searched and all attachments included in such communications;

k. Contact lists and any documents reflecting names, addresses, email addresses, telephone numbers, fax numbers and/or other contact information;

l. Cash in excess of $1,000;

m. All items related to the ordering, manufacturing, packaging, possession, storage, shipment, sale, and/or distribution of narcotics;

n. Records related to the rental or ownership of, depending on the circumstances of the defendant, apartments and/or homes, including applications, agreements, credit checks, payment records or receipts, correspondence from leasing offices or financial institutions, and/or any other items related to the lease, ownership, or payment regarding an apartment unit or home;

o. Records related to the rental or ownership of, depending on the circumstances of the defendant, business space, including applications, agreements, credit checks, payment records or receipts, correspondence from leasing offices or financial institutions, and/or any other items related to the lease, ownership, or payment regarding any of the defendants' businesses;

p. Any items related to package mailings including shipping receipts, tracking numbers, sender and recipient information, payment receipts, and/or any other items referencing the shipment or receipt of packages;

2

q. Any identification cards including driver's licenses, ID cards, benefits cards, credit cards, debit cards, or any other means of identification regarding the defendants;

2. This authorization includes the search of physical documents and electronic data (including deleted data, remnant data and slack space), including the search of the following: All cellular telephones, computers, software, peripherals and data storage devices, such as SIM cards, USB drives or flash memory devices in the Subject Premises, as described in Attachment A.

3. For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium, including cellular phones, that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a. evidence of user attribution showing who used or owned computers, cell phones, and electronic devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

b. evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

c. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

d. evidence of the lack of such malicious software;

e. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

f. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

g. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

h. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

i. evidence of the times the COMPUTER was used;

j. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

3

k.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

l.  records of or information about Internet Protocol addresses used by the COMPUTER;

m.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

n.  contextual information necessary to understand the evidence described in this attachment.

4.  This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, IRS-CI and/or DEA may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.